UNITED STATES of America for the Use and Benefit of BROWNE & BRYAN LUMBER CO., Inc., Plaintiff,

v.

MASSACHUSETTS BONDING AND IN-SURANCE COMPANY, Defendant, and Ove Gustavsson Contracting Co., Inc., Intervenor.

Civ. A. No. 60-C-334.

United States District Court E. D. New York.

June 12, 1961.

Philip G. Fitz, New York City, for plaintiff; William V. Homans, New York City, of counsel.

Anthony B. Cataldo, New York City, for defendant and intervenor.

BYERS, District Judge.

This is a Miller Act case in which the use plaintiff is Browne & Bryan Lumber Co., Inc., the defendant is Massachusetts Bonding and Insurance Company, and the general contractor who has intervened, is Ove Gustavsson Contracting Co., Inc.; for convenience, the first named will be referred to as plaintiff, and the intervenor as defendant. The Bonding Company, while the nominal defendant, tenders no issues that require decision, for the controversy boils down to the defendant's contention that the plaintiff did not make deliveries in accordance with the contract entered into between these parties.

### Pleadings

The complaint was filed April 6, 1960 and recited:

(a) A contract between defendant and the United States of December 12, 1958, wherein defendant agreed to furnish all labor, equipment and materials for the repair of the sea wall and replacement of fenders on Pier G in the Brooklyn Navy Yard. It bears number NBy 21183, specification number 21183–58.

(b) A performance bond in the penal sum of $158,768, and a payment bond in the penal sum of $79,384, conditioned for the prompt payment to all persons supplying labor and materials in connection with the said contract, which bond was accepted by the U.S.A.

(c) The entry into sub-contracts between January 29, 1959 and September 16, 1959 by the plaintiff with the defendant, the total sum payable being $27,723.85 which was said to include a New York City sales tax of $650.09 and a demurrage charge of $15.

(d) A modification of the foregoing on May 22, 1959, whereby the drilling of certain holes in the timbers was to be done by the defendant, whereby the contract cost of drilling holes not already accomplished, namely 9,378 holes, was no longer to be charged by the plaintiff against the defendant at the contract rate of 20¢ per hole; thus there was an allowance to the defendant as to such items amounting to $1,875.60, which the plaintiff has not charged against the defendant, so reducing the contract price above referred to, to the sum of $25,848.25; of this sum only $6,000 has been paid, leaving a balance due of $19,848.25 for which payment was demanded.

An answer was filed on August 30, 1960 which, in addition to denials of material allegations in the complaint including the jurisdiction of the court, alleged that the plaintiff was in default under its contract with the defendant and that the latter is a necessary and indispensable party.

By motion granted January 5, 1961, the defendant was permitted to intervene and serve and file an answer. On January 18, 1961 there was filed an intervenor's "plea," which alleged that the plaintiff had failed to perform its contract with the defendant in the respects therein enumerated, namely,

"* * * but the said lumber so delivered, was delivered undressed and unfabricated as specified in said contract, and other lumber was delivered in damaged condition which was duly rejected by the intervenor and the delivery of such part as was tendered was wholly or nearly so, delayed and that by reason thereof, the said use-plaintiff is and has been in default under the said contract."

The pleading continues that the intervenor supplied the necessary lumber and performed the work needed to dress and fabricate the lumber and did

"incur the expense of supplying certain tools and machinery necessary to dress and fabricate said lumber to make the same fit for the purpose for which it was intended * * *."

Further that intervenor demanded the delivery of 5,800 board feet of lumber to replace that quantity of lumber which had been received in damaged condition, and plaintiff's failure to supply.

It is averred that the defendant has suffered or incurred damage as indicated in the sum of $23,500, which has been demanded and refused. By a memo filed April 13, 1961 the sum is restated to be $21,918.56 which is sufficiently close to the original contract price (as reduced) of $25,848.25, to render the counterclaim suspect as being artificially inflated.

The second, separate cause of action is really a repetition of the foregoing.

An amended answer was filed February 9, 1961 in which the contract between the plaintiff and the defendant is pleaded and the alleged breach and default of the plaintiff thereunder, and an appropriate offset is sought.

The trial occupied twelve non-consecutive days between March 6 and April 5.

### General Statement

Gustavsson had a contract with the Navy as above recited and in order to acquire timber needed for the fenders, he entered into the contract later to be set forth which gave rise to the issues to be decided. It is important to bear in mind that defendant's attorney appears likewise for the Bonding Company and while he is presenting the Gustavsson case as attorney for the latter, his client initially was the Bonding Company.

■ It should be said at once that the burden of proof is upon defendant, plaintiff having shown delivery of what it contracted to provide as will be demonstrated. United States for Use of Acme Maintenance Engineering Co. v. Wunderlich Contracting Co., 10 Cir., 228 F.2d 66, at page 68; United States to Use and for Benefit of Foster Wheeler Corp. v. American Surety Co., 2 Cir., 142 F.2d 726, at page 728; United States ex rel. Johnson v. Morley Const. Co., 2 Cir., 98 F.2d 781, at page 789; United States for Use of Baltimore Cooperage Co. v. McCay, D.C., 28 F.2d 777, at page 780, Point 10.

It will be convenient to state the respective Findings, with appropriate comment.

### Findings

1. Defendant's contract with the Navy is dated December 12, 1958 for "Repair Seawall and Replace Fenders Pier 'G', complete and ready for use." "No. NBY–21183" Amount $158,768. Work to be started December 17, 1958, to be completed November 12, 1959. The following clause appears:

"IV. The undersigned [the defendant] agrees to perform on site and with his [sic] own forces the following work; namely, concrete construction and timber work."

The foregoing is Plaintiff's Exhibit 1.

2. Defendant has been paid in full by the Government the entire said contract price, plus $37,025 for extras, making a total of $195,793.

The foregoing was reluctantly established at the trial and is not disputed.

3. The written contract between these parties was initiated by a written tender by plaintiff dated December 15, 1958 bearing the notation, signed by defendant's president, reading: "1/16/59 O.K. to proceed with ordering lumber hold fab [fabrication] for confirmation." Thus Plaintiff's Exhibit 2.

The contract itself is embodied in plaintiff's letter to defendant dated January 29, 1959, approved by defendant. February 2, 1959:

Letterhead of Browne & Bryan Lumber Company, Inc.
Grand Central Terminal, New York 17, N. Y.

"January 29, 1959

"Mr. Ove Gustavsson
"135 Lakeville Road
"New Hyde Park, New York

"Re: NavDocks Spec. No. 21183/58—Repair Sea Wall and Replace Fenders Pier 'G' New York Naval Shipyard, Brooklyn, N. Y.

"Dear Sir:
"We herewith confirm your order of January 16th and have proceeded with the following:
White Oak, Common Dimension (Freight Car Stock) in accordance with NHLA Rules:

Dressed Four Sides—Standard:

(Continued)

Posts—170 Required:

12 x 12  170/10′  (x/cut to 9′0″)  (20400′BM) @ $147.00 per M′BM
2″ Chamfer—2 corners one end.
1 Dado—1½″ x 14″.
2 Dadoes—1½″ x 11¾″.                          @ $   4.50 per stick
2 thru holes for 3½″ Galv. Pipe.
12 thru holes for 1″ Galv. Bolts with Counterbore
    2″ deep x 3″ dia.
2–1″ thru holes to allow ¾″ bolt
    to go thru 3½″ pipe                   @ $   .20 per hole.

Fenders—170 Required:

12 x 14  170/16′            (38080′BM)  @ $157.00 per M′BM
2″ Longitudinal Chamfer—2 edges.
3 Dadoes—1½″ x 11¾″.
6 Dadoes—1″ x 9¾″.
1 Bevel Cut—5″ x 5″.
1 Bevel Cut—6¾″ x 14″.                    @ $ 11.10 per stick.
6 thru holes for 1″ Galv. Bolts with Counterbore
    2″ deep x 3″ dia.                    @ $   .20 per hole.

Wales—510 Required:

10 x 12  510/8′            (40600′BM)  @ $147.00 per M′BM
4 thru holes for 1″ Galv. Bolts with
   Counterbore 2″ deep x 3″ dia.
6 thru holes for 1″ Galv. Bolts           @ $   .20 per hole.

Chocks—510 Required:

10 x 10  7′6″  (x/cut to 7′2 ½″)
              (31875′BM)  @ $147.00 per M′BM
1½″ Longitudinal Chamfer—2 edges        @ $   1.10 per stick.
4 thru holes for 1″ Galv. Bolts with
   Counterbore 2″ deep x 3″ dia.        @ $   .20 per hole.

"The above prices are as listed FOB truck job site or Cars, New York City Lighterage Limits, our option.

"We will notify you when we are ready for the Naval Inspector to take up this material, this inspection to be made at no charge to us.

"We will start delivery in five to six weeks and complete within 90 days, weather conditions permitting, with a proposed delivery schedule of approximate one third of schedule per month.

"Terms are 2% 10 days, A.D.F., net 30 days.

"We have already supplied the Navy with the required number of copies of our order to our producer as per their request.

"Please sign the original and return it for our files.

"We wish, very much, to thank you for this order and assure you that it will be given our most careful attention.

           "Very truly yours,
            "Browne & Bryan Lumber Co., Inc.
             "(Signed)   Walter H. Anderson
"Feb. 2, 1959
"(Signed)  Ove Gustavsson
       "(As annotated)"

This is Plaintiff's Exhibit 5 and will be seen to call for the delivery of 1,360 pieces of timber, to be bored with holes of different diameters, to receive bolts, at the stated contract price of 20 cents per hole.

4. On April 28, 1959 defendant wrote to plaintiff re changes in size of certain of said holes:

"This is to confirm yesterdays telephone conversation as to changes in the fabrication of the timbers.

"1. Change *all* counterbores in all timbers from a 3″ diameter to a 3½″ diameter.

"2. Change size of hole into side of 12″ x 12″ Post from 3½″ to 3⅝″.
* * * "

The foregoing is Plaintiff's Exhibit 7.

These required changes were at once communicated by plaintiff in writing to its fabricator of the timbers.

These several documents constitute the written contract between plaintiff and defendant. A subsequent order was given for extra lumber on September 16, 1959 and is covered by invoice of October 6, 1959.

These latter items do not enter into this controversy. It should be said that defendant now asserts that some or all of them were included in the payment by defendant to plaintiff of $2,000 on account, on December 11, 1959.

At that time defendant had not made any specific claim against plaintiff for reimbursement concerning the matters now embraced in the counterclaim in this litigation.

5. The defendant has paid $6,000 on account to the plaintiff as follows:

| | | |
|---|---|---|
| August | 5, 1959 | $2,000 |
| September | 4, 1959 | $2,000 |
| December | 11, 1959 | $2,000 |

These payments were made in response to the frequent demands made by plaintiff which were not responded to, on the excuse that defendant was not receiving prompt payments from the Navy Department.

6. The written contract was modified by oral understanding between the parties reached on or about May 28, 1959 at the plant of National Wood Preservers Inc., Havertown, Pennsylvania, whereby defendant undertook and agreed to bore holes in the timbers which by that time had not been already bored. This change was agreed to as the result of defendant's assertion that too much time was being taken by Wood Preservers and that Gustavsson could make much faster progress in that operation by using his pneumatic equipment, than by the electric power which was being used.

*Comment:*

There is no conflict in the testimony as to the fact that defendant would take over the boring of holes. The witnesses for plaintiff were Anderson, the plaintiff's salesman who negotiated the contract, and Jacoby, an officer of Wood Preservers. Gustavsson testified for defendant, but not to deny the essential fact in the foregoing finding.

7. There was no agreement that the cost of boring the holes by defendant would be at other than the contract price stated in Exhibit 5, nor was it made the subject of any written memorandum submitted by defendant to plaintiff at any time.

*Comment:*

It is true that Gustavsson testified that he stated to Anderson that the hole boring would be a matter of expense. He said further that as an accommodation, plaintiff would furnish certain wood borers and auger bits to defendant, and seemingly that was done. He also said that there was no discussion of the cost to defendant per hour of the drilling operation, but that "Anderson agreed to take care of it."

Anderson denies the latter statement; since this was an important element of the contract (for without proper holes the timbers could not have been bolted into place to accomplish the fender-building job), it cannot be ignored as a mere casual incident to a discussion between

the parties arising in the course of their relationship.

There were 10,880 holes to be drilled according to Exhibit 3, at an agreed cost of $2,176, of which 9,378 were taken over by defendant, with a credit to it of $1,-875.

These figures make it obvious that if a change in the rate of charge involved was indeed an incident of the said modification of the contract, the defendant would have so notified the plaintiff in writing, stating the amount of the new figures or at least the need for a new computation. For failing so to do, it results that the defendant is restricted to the contract price of 20 cents per hole, for any and all hole drilling that it undertook, as the consequence of this verbal modification of the written contract. How many borings were so required is another question, which has not been demonstrated.

8. The plaintiff delivered to the defendant the timbers described in Plaintiff's Exhibit 3 according to the terms of the contract as modified according to Finding No. 7, with the exception of a few timbers that had to be replaced.

*Comment:*

This Finding is the crux of this case, and requires detailed exposition.

The defendant asserts a counterclaim made up of sundry elements, and they will be dealt with separately. The basic question is whether plaintiff made deliveries in accordance with its contract, and the affirmative finding in that respect is based upon these considerations:

(a) The precise respects in which the timbers were to be fabricated, i. e., the nature, characteristics and dimensions of the various mechanical operations to be applied in order to render them adaptable for assembly and erection into fenders, were specified in shop drawings prepared by defendant and furnished by it to the plaintiff after approval by the Navy Department; thus Plaintiff's Exhibit 4.

Those drawings were sent to Wood Preservers which did the required work (except as to discontinuance of boring holes, as explained) on these 1,360 timbers as they were received by it from the lumber mill which was the source of supply.

The timbers were not shipped to defendant however until they had been inspected by the U. S. Navy inspector at the Wood Preserver plant. The witness Morris was the inspector and he testified that he made the required inspections at the plant by comparing the fabricated timbers with the plans and specifications (the shop drawings) and checking the material; that he certified approval by striking the end of each timber with a hammer, which caused a visible marking. Then he released the timbers for shipment. This was true except as to one "form #4" which was released without inspection. This testimony was not contradicted or questioned.

(b) The defendant argues that the timbers were not delivered in units, i. e., a complete set for each "bay." Seemingly the fenders were portions of a pier which was about 699 feet long on one side and 581 feet on the other, having an outboard width of 131 feet, composed of sections called bays. Three wales and chocks composed one bay; it may be assumed that there were also two posts to which the elements were fixed but that is not clearly stated in the evidence. It does appear, however, that Gustavsson asserts that delivery of the timbers should have been in units needed for each bay, and that because this was not done, his performance was delayed by the time required to assemble the timbers, bay by bay, for convenient installation. It is not necessary to discuss this contention, because the contract contains no such provision, nor does any arise by necessary implication. If that had been a condition which had to be met by the plaintiff, the contract should have so specified. In the absence of such a provision, the plaintiff cannot be charged with alleged damages said to have resulted from its failure to do that which it had not undertaken, and the defendant's contentions

in this respect cannot be and are not sanctioned.

(c) As to alleged delays in delivery: The contract reads in this respect:

"We will start delivery in five to six weeks and complete within 90 days, weather conditions permitting, with a proposed delivery schedule of approximate one third of schedule per month."

It was stipulated that sixteen deliveries were made from April 28, 1959 to August 13, 1959, inclusive. The 90 days started to run on January 29, 1959 and expired April 29, 1959. This means that deliveries were not completed within 90 days as undertaken, but that 100 additional days were required.

As to this, it is to be said that Jacoby (Wood Preservers) testified that there were some delays caused by weather conditions, rain and mud, such as were indicated in the expression as to weather conditions above quoted. There was no contra testimony on this subject. It is further a fact that some delay was occasioned by agreed changes in the size of the holes to be bored, while that was yet a part of plaintiff's undertaking. The time so involved cannot be clearly discerned from the testimony but it occurred during April, 1959.

Again, the defendant was not charged for any delay by the Government, but was paid its contract price in full.

Further, Gustavsson said he was making no claim for "stand-by" time, i. e., idle time caused by alleged failure to maintain the 90 day delivery clause, beyond May 22, 1959. Thus the time between April 29, 1959 and May 22, 1959 would encompass the delays in delivery.

For this interval of 23 days, the defendant argues that it has established its counterclaim to the extent of

| | |
|---|---|
| Wages paid | $2,520 |
| Idle Crane | 2,100 |
| Total | $4,620 |

The testimony in support of this claim is found to be entirely unconvincing.

The Government inspector Fritzson, made daily inspections of the defendant's work, and reports to his superiors to put them into a position to approve the contractor's bills for payment. He testified that from March 23, 1959 to and including May 21, 1959 he observed no stand-by time on the part of defendant, while his daily reports described the nature of the daily work in progress.

The synthetic nature of the testimony of defendant's witnesses Gustavsson and Saladino, plus the fact that the former either convinced himself to, or was persuaded that he should, testify as he did in support of the entire counterclaim, has been weighed against what the distinterested witness Fritzson said, with the result that his version is found to be the more convincing, as to both elements of this portion of the counterclaim, which is therefore disallowed.

In summary therefore as to delivery, the only default which can be charged against the plaintiff is in respect of 2,100 board feet of lumber purchased by defendant to replace certain timbers which were delivered in a faulty condition, i. e., split or broken ends, at the proven cost of $388.50. The items so embraced are not clearly shown, but the result is deemed to have been established as stated, and so much of the counterclaim is approved.

9. The alleged corrective fabrication to the timbers delivered by plaintiff to defendant has not been shown to have been caused by plaintiff's failure to perform its contract.

*Comment:*

It is perhaps unnecessary to repeat that if the plaintiff performed its contract it is entitled to have judgment in this case. The testimony has been carefully weighed to ascertain whether defendant has sustained its burden of proof to establish that plaintiff did not so perform.

In that effort the Court has been confronted with the uncongenial task of examining into a day by day analysis of contentions that the timbers as delivered

were not in conformity to the contract as to physical characteristics, of dimensions, conformation, size and position of holes, etc., with a view to reaching a conclusion on this subject.

The fact that the defendant did not reject any of the said timbers is admitted by Gustavsson, and attested to by Anderson, the plaintiff's salesman, and Burghardt, its Vice-President.

It is difficult to understand why there was no rejection or formal notice by defendant to plaintiff that it would be held financially accountable to defendant in connection with the considerable services it says it was required to render as compensation for that which it claims to have been required to do, in order to make these timbers conform to the shop drawings (Plaintiff's Exhibit 4).

No such written or formal notice was given prior to January 21, 1960, when Defendant's Exhibit K was handed to Anderson. That was nine days after the Bonding Company acknowledged plaintiff's letter of January 5, 1960 by which the latter called attention to defendant's failure to pay the balance due under the contract.

The correspondence in that connection is found in Plaintiff's Exhibit 11 and 11A, the first being a letter addressed to the Bonding Company, dated January 5, 1960, and contains the following:

"This is to advise you that we are one of the prime material suppliers for this project to Ove Gustavsson and that a substantial quantity of material is still unpaid for."

The second is the acknowledgment of January 12, 1960 and contains the following:

"I have been informed that our principal is in no financial difficulty and that this indebtedness will be cleared up in due course."

The plaintiff had written to the defendant on September 10, 1959 [Exhibit 18] as follows:

"We wish, at this time, to point out to you your long outstanding balance.

"We note that a payment of $2,-000.00 was made by you on September 4th, leaving an unpaid balance of $20,080.57.

"A check from you, to substantially reduce this long overdue account, would be greatly appreciated."

The failure of Gustavsson to present to the plaintiff any demand for payment of a sum of money deemed by the defendant to be due as the result of the various matters now constituting the defendant's counterclaim, until after the correspondence with the Bonding Company, cannot be ignored in exploring the subject of the plaintiff's performance of its written contract.

As has been written, there was no claim advanced by Gustavsson until January 21, 1960, at which time he handed to Anderson a pencil memorandum, six pages long purporting to indicate work that the defendant had been required to perform in connection with the timbers delivered by the plaintiff. This is Defendant's Exhibit K, and purports to contain various sub-totals following the words "Total man hours" and certain items which need not be here repeated; among them is "Layout of holes, dadoes, chamfers, etc., $800." It is not possible to state a total in dollars of the amount seemingly asserted in this memorandum. The significant part of the picture is that this was the first occasion on which the plaintiff was confronted with anything like a demand for a sum of money allegedly owing by the plaintiff to the defendant.

If that memorandum had been handed by Gustavsson to the plaintiff prior to the writing by the latter of the letter above quoted to the Bonding Company, it would at least be consistent with his belief that he ought to confront the plaintiff with a demand for a sum of money based upon an asserted failure on the part of the plaintiff to perform its contract. Of course it would not follow that he was justified in making the claim, but at least such an action would have offered a striking contrast to the belated assertions in Exhibit K.

The failure on the part of Gustavsson to advance such a claim prior to the time that his interests were taken in charge by the attorney for the Bonding Company cannot be disregarded in weighing the testimony of Gustavsson and Saladino on the essential issue of plaintiff's performance of its contract.

In this connection, it has not been overlooked that Anderson testified that when he and Burghardt interviewed Gustavsson in connection with Exhibit K and in an effort to avoid litigation by making a reasonable settlement, the offer which they made was stated by Gustavsson to be acceptable to him but that he must first consult his attorney because he was not "a free man." That testimony was not denied and has necessarily entered into an appraisal of the good faith of the defendant's entire case.

Many of the various elements of the defendant's counterclaim as argued, long antedate the plaintiff's written demand contained in Exhibit 18, and it is difficult to reconcile those claims with the payments on account which have been above stated because it strains the Court's credulity to insist that beginning on March 23, 1959 and continuing through June 16, 1960, Gustavsson was secretly building up a claim for money damages totalling $21,918.56, without giving any notice whatever to the plaintiff that such a demand was in the process of accumulation.

The item of corrective fabrication totals $9,867.50 based upon what are said to be Gustavsson's records, but the entire item is lacking in specific data. In this connection, if any testimony had been offered that a given number of timbers delivered at or about a given time were deficient, and that notice thereof had been given to the plaintiff, it would be possible to accord to this branch of the testimony greater weight than this Court is able to bring to bear.

The item of $3,400 alleged to be for the use of the crane owned and operated by the defendant, cannot be given serious consideration for two reasons:

(a) It was part of the defendant's equipment which he was supposed to use in the performance of his contract with the Navy, and presumably entered into the computation of the total charge that he submitted to the Government.

(b) There is no mention of any such item in Exhibit K, which clearly characterizes it as a remote afterthought, created elsewhere than in Gustavsson's office.

The same remark applies to the use of other items of equipment that Gustavsson must have expected to use when he entered into the contract with the Navy Department; also items for the use of compressed air.

With reference to the cost of layout [$800], this item is not understood. Of course when Gustavsson purchased these timbers, he understood that he had to assemble them in order to perform his contract with the Navy.

■ Taken as a whole, the defendant's testimony is entirely unconvincing as to the plaintiff's failure to perform its contract. It may be that Gustavsson had more work to do for the Navy than he anticipated at the time that he entered into the main contract; it may be that there were changes directed by the Navy which entailed the rendition of services over and beyond the original contemplation of Gustavsson, but even if these assumptions are true, it does not follow that the plaintiff has not substantially performed the contract heretofore explained, except as to the item of $388.50 mentioned in the Comment under Finding Number 8.

### Conclusion of Law

The defendant's counterclaim is disallowed and judgment is directed to be entered for the plaintiff in the amount of $19,459.75, with interest and costs.

If additional findings are desired, they may be settled on notice.