UNITED STATES ex rel. JOHNSON v. MORLEY CONST. CO. et al. (HARRINGTON et al., Interveners).

No. 182.

Circuit Court of Appeals, Second Circuit.

July 29, 1938.

784

Gibbons, Pottle & Pottle, of Buffalo, N. Y. (Frank Gibbons, of Buffalo, N. Y., of counsel), for Maryland Casualty Co.

Martin J. O'Donnell, of Kansas City, Mo., for Morley Const. Co.

Lansdowne & Lansdowne, of Buffalo, N. Y. (Robert J. Lansdowne, of Buffalo, N. Y., of counsel), for Harrington, as administrator of Moody L. Rupp.

Kennedy, Holand & DeLacy, of Omaha, Neb., and Edwin J. Culligan, of Buffalo, N. Y. (Stanley Montfort, of Buffalo, N. Y., of counsel), for Concrete Engineering Co.

John Marshall Gorman, of Buffalo, N. Y., for J. S. Thorn Co.

McKay & Headley and Clarence McKay, all of Rochester, N. Y., for Marcus Bonsignore et al.

Before L. HAND, SWAN, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

The original defendants, the Maryland Casualty Company and the Morley Construction Company, appeal from a judgment against them, entered upon the verdict of a jury of one, in an action upon a construction contract between the Morley Company and the Veterans Administration of the United States, for the erection of a hospital at Batavia, N. Y. The Maryland Casualty Company was the surety upon this contract; the plaintiff, Johnson, was a sub-contractor of the Morley Company, doing the roofing and other parts of the build-ing: Rupp, Harrington's testator, was the sub-contractor for the grading: the Concrete Engineering Company furnished temporary forms for setting the concrete: J. S. Thorn Company furnished the window frames for the buildings: and Marcus Bonsignore and twenty-seven others were laborers engaged upon the work. Johnson originally brought the action against the Morley Company and the surety, and the other parties mentioned intervened; still other parties also intervened, but the surety thereafter paid their claims, as well as the plaintiff's, and took an assignment of them: it now presses them against the Morley Company. These assigned claims are admittedly good in substance; but the Morley Company disputes their collection by the surety and in this action. The litigation divides itself into two parts: (1) The main action against the Morley Company upon the assigned claims; (2) the several claims of the four intervenors whom we have mentioned (counting Bonsignore and the other laborers as one).

(1) Liability of the Morley Company to the Surety, as Assignee of the Intervenors' Claims.

As we have said, the Morley Company does not dispute that the surety's assignors had sub-contracts with it which they performed in accordance with their terms: it does dispute its liability in this action and to the surety. It says that the action was premature, and that, if not, the surety has lost its rights, either as assignee, or in subrogation. The facts are as follows. The writ was served on Morley Company on May 28, 1934: it appeared on June 23d and filed an answer: on August 31, 1935, it attempted "to appear specially" in order to object to the jurisdiction of the court and to strike out the pleading of the surety. There can be no doubt as to the jurisdiction of the district court. The final settlement of the Veterans Administration with the Morley Company was on November 13, 1933, and § 270 of Title 40, U.S. Code, 40 U.S.C.A. § 270, allowed the action to be brought at any time between six months and a year "after performance and final settlement". But the Morley Company says that, regardless of this, the action was premature under the terms of Johnson's sub-contract. That provided that the Morley Company should pay Johnson monthly as it received its own payments from the Administration at the rate of 85% of the work completed each month,.

and that "the final payment shall be made upon completion and acceptance of the work * * * and upon receipt by the contractor of the final payment from the Veterans Administration". The Veterans Administration issued its final warrant to the Morley Company in November, upon which the United States Treasury issued its cheque thereafter. The surety brought a suit in equity against the Morley Company in the Western District of Missouri to enjoin the payment of this cheque and succeeded; and the Morley Company argues that for this reason there has never been "final payment" by the Veterans Administration; and that, if the action was premature as to Johnson, it was premature as to all the intervenors. United States v. McCord, 233 U.S. 157, 158, 34 S.Ct. 550, 58 L.Ed. 893. The question turns upon the meaning of the phrase, "final payment", in Johnson's contract. This could scarcely have referred to anything but the warrant, issued by the Administration, for that body could go no farther; could make no actual "payment". But the point is bad for another reason. The Treasury did deliver the cheque to the Morley Company and the stipulation was of course designed to protect the Morley Company until then—that is, until it had control of the money—but there was no reason to postpone the sub-contractors thereafter. The Missouri suit was in substance an attachment, and obviously sub-contractors were not to wait while the Morley Company arranged its affairs with its other creditors; if these tied up its funds, it was no affair of the sub-contractors. The argument takes another and obscurer form on the theory that the surety made payment impossible by attaching the cheque. This is spoken of as the prevention of a "condition precedent"; but that is meaningless. The doctrine invoked excuses performance of a condition precedent to an obligee's right of action: here the surety is the obligee and the Morley Company the obligor; it is the surety which must show performance of the condition precedent, and it did so when it proved that the intervenors had performed their sub-contracts. Moreover, the Missouri suit ended in the surety's favor (Morley Construction Co. v. Maryland Casualty Co., 8 Cir., 90 F.2d 976); and it is absurd to assert that the prosecution of a valid claim could affect the surety's power to prosecute the assigned claims. If the Morley Company had not enough money to meet all its debts, that was its misfortune.

■■ The only other point which needs discussion is that the surety filed no supplemental pleadings after taking the assignments. At common law the transfer of a cause of action, pendente lite, was cause for abatement, if the defendant raised it by the plea, puis darrein continuance, but the action could be revived by the transferee by scire facias. Nome & Sinook Co. v. Ames Mercantile Co., 9 Cir., 187 F. 928. This action is at common law (Illinois Surety Co. v. United States, to Use of Peeler, 240 U.S. 214, 223-225, 36 S.Ct. 321, 60 L.Ed. 609), and under the Conformity Act, 28 U.S.C.A. § 724, it is governed by the New York practice. In New York in case of a transfer of interest, pendente lite, the action is to be continued unless the court directs the transferee to be substituted. § 83 of the New York Civil Practice Act. Therefore no supplemental pleading was necessary.

### (2) Rupp's Claim.

Rupp's administrator presses this claim against the surety under Rupp's sub-contract. (It will be more convenient to disregard the administrator and speak as though Rupp were the claimant.) He had a sub-contract to do all the grading and excavating, and substantially all of the concrete work on the job: his claim is in three parts. First, he claims the balance of the contract price which he had never received. Against this the surety asserts set-offs and that Rupp wrongfully abandoned the job and disqualified himself from recovery. Second, he claims for extra work in regrading a part of the surface, made necessary, as he says, by a mistake in the plans. Third, he claims as extra work certain rock excavation for which the Morley Company had been paid, although he did the work. We shall begin with the two claims for extra work.

### (2a) Cost of Regrading.

■ The contract required Rupp to grade an oval in front of the main hospital building. In doing this he used a map prepared by the Administration and given him by Morley; and took as his base a monument, already in place before he began and shown on the map, together with a legend, "Grade El. 910.0". Rupp assumed that the figure "910.0" indicated the true level at the top of this monument, and graded accordingly. In fact, the mark

was true only for the foot of the monument and his grading was fourteen inches too high; for this reason he was compelled to regrade much of the area, for he failed to discover the mistake until nearly the whole job was done. The appeal is from a judgment entered on the verdict of a jury, and all disputed issues must be taken in favor of Rupp if there is any evidence to support them. There was ample testimony that a contractor, furnished by an owner with plans and specifications, would be justified in accepting as authoritative a monument and the grade shown thereon without seeking other bench marks. The surety then argues that, even so, a careful contractor would have discovered the mistake before the work had been as far done as it was. The evidence upon this is conflicting and obscure, but we should clearly not be justified in upsetting the verdict. Rupp began by stripping off the top surface, and there was testimony, coming in part from the defendant's own witness, that thereafter it would have been extremely hard to ascertain that he was working on wrong levels without "cross-sectioning" the whole area. Next, the surety argues that Rupp was concluded by a ruling against him of the superintendent of the Administration. The main contract provided that "all disputes concerning questions of fact arising under this contract shall be decided by the contracting officer, or his duly authorized representative * * * whose decision shall be final and conclusive". The specifications also provided that "in case of any discrepancy in the figures or drawings the matter shall be immediately submitted to the contracting officer without whose decision said discrepancy shall not be adjusted by the contractor". The Administration's superintendent decided that Rupp had not been justified in taking the monument as his level, but should have referred to a bench-mark nearby. As between Rupp and the Morley Company the dispute depends upon the sub-contract which provided that "the contract between the contractor and the owners wherein it requires the work to be done according to the plans and specifications above referred to and other requirements, as interpreted by the superintendent, * * * is also made a part of this contract, and the decision of the said superintendent shall be final and conclusive". Also that "should there be any discrepancies in the plans and specifications the decision of the superintendent * * * shall be final". These clauses subjected Rupp to the decision of the superintendent, but no further than the Morley Company was itself subject, contrary to the surety's contention. True, the main contract speaks only of questions of fact, while the sub-contract appears to make the decision final as to whether the work has been done according to the plans and specifications; but it is plain from the reference to the main contract that no more was meant than to incorporate its provisions. Indeed, it would be absurd to suppose that the Morley Company expected the superintendent to go beyond his duties, and decide issues arising under the sub-contract which were not within his jurisdiction under the main. The issue which he actually decided was not within his powers; it was not a question of fact, but of Rupp's obligations under the contract; that is, whether he was bound to look for bench-marks beyond the plan given him. Pitt Construction Co. v. City of Alliance, 6 Cir., 12 F.2d 28; Borough Construction Co. v. City of New York, 200 N.Y. 149, 93 N.E. 480; 140 Am. St.Rep. 633; Faber v. City of New York, 222 N.Y. 255, 118 N.E. 609. It is even plainer that the superintendent's ruling had nothing to do with any discrepancies "in the figures or drawings".

The judge allowed $10,350.29, for the regrading, to which the surety objects because in the end Rupp did no more excavation than he had figured upon originally in his bid. We cannot see the relevance of this. Rupp did the work called for by the contract, as he was justified in understanding it; when he finished, he was entitled to the contract price: the equivalence of what he had done with what he had supposed would be necessary; had nothing to do with the case; if the contract turned out more profitable than he had expected, it was his good fortune. When he was required to do part of the work over, it was an extra, something added to what he had engaged to do. In fact, he actually did do more than dig to the right level, because, when the mistake was discovered, although he had not raked, he had thrown back part of the top soil, which he had to take off again. That is however beside the point; the work required was the work described in the plan, and the work described in the plan was the work as Rupp read the plan. For all else

he could recover. United States v. Spearin, 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166; Christie v. United States, 237 U.S. 234, 35 S.Ct. 565, 59 L.Ed. 933. Rupp did not complete the hand-raking because he threw up the contract before that stage had been reached, but the judge made an allowance for this of $3,862.13, which, if anything, was too large. We can see no reason to disturb the verdict as to this item.

### (2b) Rock Excavation.

The main contract provided that, should rock be encountered within the limits of the required excavation, payment for its removal would be treated as an extra. Rupp's sub-contract contained no such clause, and the Morley Company refused to pay him for the rock which he had taken out and for which it had been paid. As Rupp had agreed to do all the work "as called for in the plans and specifications" of the main contract at a fixed price of $23,275, he would have had no claim if the main contract had not allowed for rock excavation as an extra; but it seems to us that the word, "specifications", in his own contract should not be limited to the description of the work to be done. It included all provisions of the document annexed to the main contract, and entitled "specifications". These covered much more than a description of the work; they described many of the duties of the parties, without which the contract would not have been complete. Obviously the sub-contract meant these to be a part of itself; the Morley Company expected Rupp to be limited as it was, and it must be held also to have meant him to have the same privileges. Anything else would have been grossly unfair.

### (2c) The Set-Off for Digging Trenches and Piers.

The set-off against the sum reserved by the Morley Company arose from work which it was forced to do, and which the surety says that Rupp should have done. His sub-contract was not very clear, but both parties seem to agree it required him to dig not only over the whole ground plan of the buildings, but also trenches and wells for walls and piers. In the case of Buildings 1 & 2 he refused to do this, insisting that it had been understood from the outset between him and Morley that he was to dig only by steam-shovel, and not by hand as is necessary for trenches and

wells. He took this position in a letter addressed to Morley on May 27th, 1933, which Morley never answered. Furthermore, after the Morley Company had itself done this work, it never included a charge for it in any of the numerous accounts which it sent to Rupp, nor did its books show anything of the kind. Reif, Rupp's engineer, testified that before the contract was signed the Morley Company gave them plans and specifications which showed no trenches or wells; and also that when the dispute arose while the work was in progress, Morley agreed to be content, if Rupp would dig with the steam shovel below the ground level of the buildings, so that he might have a space in which to put the dirt taken out by hand. The judge said in his opinion that this constituted an accord and satisfaction; and we are not prepared to say that he was wrong, though the evidence is not very satisfactory. If Rupp's contract bound him to do the hand-shovelling, he gave no consideration by digging generally below the plan level, if that was the accepted way to provide space for the hand-shovelled dirt, as some of the witnesses said. On the other hand, if there was a fair dispute about Rupp's obligation to hand-shovel, there might have been an accord, unless a contractor who is only to steam-shovel, always understands that he must go below the plan level in order to accommodate the hand-shoveller who follows him. The testimony was equivocal about the last. While therefore, as we have said, we will not say that there was no support for an accord and satisfaction, we prefer to say that there was evidence to support a preceding oral understanding—on which the written contract could be reformed—that Rupp should do only steam-shovelling. When Morley failed to answer Rupp's letter of May 27th, promised to do the work, never attempted to charge for it, and never protested against the refusal, the natural conclusion—at least an entirely permissible conclusion—is that he did not suppose Rupp to have promised to hand-shovel. The fact that the judge's opinion shows that he reached his result by another route, is not important; we cannot disturb his verdict, if there was any evidence to support it. His opinion is not a finding.

### (2d) Rupp's Delays and Refusal to Complete.

The surety also insists that Rupp forfeited any right to the amounts reserved

under the contract because of his refusal to complete and of his earlier delays. Rupp did all the work except the hand-raking and two or three trivial items; but his refusal to do these was deliberate, though he excused it because the Morley Company had failed to pay him what was due. That excuse we must accept as at least made in good faith, for the account between them was complicated, and the judge found that Rupp was right. If so, and if the default was not serious, and the cost of supplying it was clearly proved, Rupp might recover, notwithstanding his refusal. Spence v. Ham, 163 N.Y. 220, 57 N.E. 412, 51 L.R.A. 238; Jacob & Youngs v. Kent, 230 N.Y. 239, 129 N.E. 889; Nieman-Irving & Co. v. Lazenby, 263 N.Y. 91, 188 N.E. 265. The original contract price was $23,275, and the court allowed $11,000 as extras making a total of about $35,000; the cost of hand-raking ($3800) was therefore only about 10% of the whole. It was the last work to be done, easily separable from the rest and calculable, and although the obligation to hand-rake was unquestioned, it was excused if the Morley Company was in fact in default on its payments. It is true that ordinarily the contractor in such cases believes that he has performed, while here he believed that he was excused from further performance, but we can see little difference between these two kinds of mistake. The whole doctrine is anomalous anyway; the contract has made performance an express condition upon payment, and the exception is entirely the creature of equity. As such, there is as much reason for accepting as an excuse a mistake as to what performance the contract imposes upon the owner, as a mistake as to what it imposes upon the contractor himself.

■ There remain the questions of Rupp's delays. By the sub-contract all the work should have been completed by May 15, 1933, but both sides concede that the time was extended until July 19th following. Rupp finally quit the job on September 26th and the work was still unfinished. The Morley Company had a provision for liquidated damages in the main contract, and Rupp a similar one in his. There was testimony that Rupp, who had become anxious about the delays, several times consulted with Morley personally, and that Morley assured him that he would not be penalized for any delays, because nobody was ever penalized under such contracts. Rupp could only have understood this to mean that he would not be called upon—so far as concerned the liquidated damages—to complete within the stipulated time. Maryland Steel Co. v. United States, 235 U.S. 451, 35 S.Ct. 190, 59 L.Ed. 312. Since this excused liquidated damages only because it excused performance, it excused compensatory damages as well. We conclude therefore that there was evidence to support the verdict as to Rupp's claim.

### (3) Claims of the Laborers.

■ The Morley Company contracted with one, Giamberardino, to furnish all unskilled labor necessary under the plans and specifications. The workmen whom he employed were paid lower wages than the prevailing rate; but gave releases under seal, which declared that they had received the prevailing rate. Notwithstanding this, the claimant, Bonsignore, one of them, on behalf of himself and the rest, claims the difference between the amount paid and the prevailing rate, by virtue of a provision of the specifications which read as follows: "in contracts in excess of $5,000, the rate of wages for all laborers and mechanics employed by the contractor or any sub-contractor, on the public buildings covered by this contract shall be not less than the prevailing rate of wages". This is in the language of the Act of March 3, 1931 (46 St. at L. 1494), and the Executive Order of January 19, 1932, providing that all public contracts shall contain such a provision. The surety answers by saying that the contract did not incorporate the specifications, and that if it did, the laborers released any rights so secured to them. The Morley Company's contract provided that it should perform all the work "in strict accordance with the specifications, schedules and drawings, all of which are made a part hereto". By what process of reasoning it is supposed that this incorporation of the specifications did not include the provision for wages passes our understanding. The position is even less plausible than in the case of rock excavation, for the specifications were actually a part of the main contract itself. We hold that the laborers were donee beneficiaries of the promise. Restatement of Contracts, §§ 133, 135. If so, their releases were void. The statute was passed to protect them against the economic pressure it was assumed they would be unable to resist, if offered a job. To this end it was as neces-

sary to deny them the power to bargain away their privilege after they had performed their labor, as before. We do not say that if the contract had not incorporated the statute, the laborers would have had the privilege at all; but the statute, which forbad any contract that did not protect them, forbad any release—another contract—which deprived them of the protection so granted. The Court of Appeals of New York by a bare majority held otherwise in 1904 (Ryan v. New York, 177 N.Y. 271, 69 N.E. 599), but it is very doubtful if it would be followed today (Wright v. State of New York, 223 N.Y. 44, 119 N.E. 83). In any event we are not dealing with the law of New York, but with the construction of a federal statute; and while we have found no decision in point, we are satisfied that the statute cannot be circumvented by so easy a device. We hold that the claims are valid.

(4) Set-off against the Claim of the Concrete Engineering Company, Inc.

The Concrete Engineering Company agreed to supply the Morley Company with temporary forms to use in setting up concrete on the job, and with permanent window-frames in all the buildings; the window-frame contract was sub-let to the J. S. Thorn Company at the same price. We consider these two claims separately. As to the window-frames the only question is of the validity of certain counterclaims of the surety against the Concrete Engineering Company and the J. S. Thorn Company for delay in performance. As to the temporary forms the surety asserts a set-off against the claim of the Concrete Company for patching done by the Morley Company, which was made necessary because the forms were defective. The Concrete Company replies that this patching was done, not because of defects in the forms, but because the Morley Company improperly used quick setting cement. The forms were apparently defective at the start, but they were corrected, at least in part, and the worst trouble (estimated by one of the witnesses, to amount to 75% of the whole) was in Building No. 1, where there is no doubt that quick-setting cement was used. The testimony of the very cement company which furnished the cement, was that the first two carloads did not come from Buffalo as the rest did, so that there is no certainty that all the cement was alike. The trouble abated a good deal as the job went on, although apparently it never wholly disappeared, and we are not at all clear where the truth lay, or how we should decide, had we to render a verdict; the chances seem to be that part of the patching was due to defects in the forms, and part to defective cement. But the surety had the burden of proof of proving its damages, and certainly it failed to show how much of the patching was due to the fault of the Concrete Company.

(5) Counterclaims against the Concrete Engineering Company and the J. S. Thorn Company.

Before trial the surety twice moved for leave to interpose counterclaims against the Concrete Company and the Thorn Company for delay in furnishing the window-frames mentioned above. The first time the district judge—not the judge who tried the case—denied this application in the exercise of his discretion; the second time, as a matter of law. We are therefore presented with the question whether the counterclaims set up valid causes of action. The work was delayed beyond the time stipulated in the contract of the Concrete Company, and damages were alleged to have resulted. When the Concrete Company ordered window-frames from the Thorn Company, "as per contract" between itself and the Morley Company, we may assume, arguendo, that the Thorn Company promised the Concrete Company to furnish the frames within the time limit fixed in the Concrete Company's own contract. If so, the Concrete Company had a claim against the Thorn Company in case it were itself compelled to respond to the Morley Company. We have already said that such claims are actions at law brought by the claimants; and the Morley Company could have used the counterclaim defensively, had it chosen. The question is whether the surety may. In its mouth the defence, if it exists at all, is equitable, but equitable defences, even when they call for "affirmative relief", may be pleaded at law. § 398, Title 28, U.S.Code, 28 U.S.C.A. § 398. If the surety could have filed a bill to take advantage of the counterclaim, it may use it for itself in this action.

It is indeed true that when the principal is solvent, a surety cannot compel him to assert a counterclaim in the surety's exoneration, nor can the surety use it himself, when sued. Meeker v. Halsey, 2 Cir., 87 F.2d 299-301. The principal is allowed at his pleasure to prosecute his own claim,

so long as he remains able to respond to the surety's claim over against him for indemnity. But this ceases to be true as soon as the principal becomes insolvent. If the creditor then recovers from the surety, the surety has no recourse over against the principal, but must bear the loss except for such dividends as he may get in the insolvency proceedings. Yet having recovered from the surety and realized upon his claim, the creditor is without set-off when sued on the counterclaim by the principal's trustee or receiver, and the recovery goes to swell the estate. Had the creditor not sued the surety, he could, and of course would, have used the claim as a set-off against the counterclaim. Thus, the upshot of denying the surety a right to assert the counterclaim is to enhance the principal's estate at the expense of the surety, which is contrary to the fundamental relation between the two. The truth is that after insolvency the counterclaim becomes the creditor's security for his own claim, a means by which it can be paid dollar for dollar through his right of set-off. However, it is only after the surety pays the creditor that he is subrogated to all the creditor's securities, and that would be a condition here, except that the surety cannot pay the debt without losing the security, for it consists only of the creditor's power to defeat the counterclaim by using his claim to cancel it. Therefore to exact of the surety the normal condition of paying the debt, would be to destroy the security, and it follows that he must be allowed to set it up himself. The direct authority is for the most part dictum, but it is uniform. Clark Car Co. v. Clark, 3 Cir., 48 F.2d 169; Fidelity & Deposit Co. v. Duke, 9 Cir., 293 F. 661; Gillespie v. Torrance, 25 N.Y. 306, 311, 82 Am.Dec. 355. The principle is perhaps best illustrated in those decisions where the surety is allowed to file a bill compelling the creditor and the principal to adjust their controversies. Scholze v. Steiner, 100 Ala. 148, 14 So. 552; Livingston v. Marshall, 82 Ga. 281, 11 S.E. 542; Armstrong v. Warner, 49 Ohio St. 376, 31 N.E. 877, 17 L.R.A. 466; St. Croix Timber Company v. Joseph, 142 Wis. 55, 124 N.W. 1049. Cf. Wright v. Austin, 56 Barb. 13. Since the counterclaim cannot be split, it follows that the surety must be allowed to recover upon it in full, holding any overplus in trust for the Morley Company.

But this reasoning does not apply to the proposed counterclaim against the Thorn Company. The statute gave to that company a direct right of action against the Morley Company, which that company could not meet by any counterclaim. It is true that it had a right of action on its contract with the Concrete Company for damages for delay, and that the Concrete Company in turn had a right of action against the Thorn Company for indemnity upon its own contract. But the Morley Company's counterclaim against the Concrete Company was not security to the Thorn Company for its direct claim under the statute against the Morley Company; and the surety cannot avail itself of it. The contract of the Concrete Company with the Thorn Company conferred no rights upon the Morley Company; the notion that this contract may be treated as an assignment of the contract between the Morley Company and the Concrete Company is absurd.

It follows that it was right to refuse leave to file the counterclaim against the Thorn Company. Furthermore, the joint judgment of that company and the Thorn Company—payment of which was by stipulation to be made to the Thorn Company—will not be affected by any recovery against the Concrete Company because such a recovery will not cancel payment to the Thorn Company; but the judgment of the Concrete Company for the temporary frames will be reduced by any recovery on the counterclaims, and should not be paid until the counterclaim has been tried. The judgment in favor of all the claimants will therefore be affirmed, but the order refusing to allow the counterclaim against the Concrete Company will be reversed, and the counterclaim may be filed. Execution on the judgment for the temporary frames will be stayed to await the event of the trial of the counterclaim.

### (6) Interest.

The surety maintains that it is not liable for interest under § 160 of the N. Y. Civil Practice Act; but it misreads the statute, for the penal sum of the bond exceeds the total recovery with interest.

The judgment is affirmed except as to the order denying leave to file a counterclaim against the Concrete Engineering Company, which is reversed. The surety is given leave to file such a counterclaim, and execution upon the judgment in favor-

of the Concrete Company for the temporary frames will be stayed, pending trial of the counterclaim.