**In the Matter of YALE EXPRESS SYSTEM, INC., Debtor.**

**BOSTON INSURANCE COMPANY, Appellant,**

**v.**

**F. Ralph NOGG, Trustee, et al., Appellees.**

**No. 315, Docket 30199.**

United States Court of Appeals
Second Circuit.

Argued April 7, 1966.

Decided May 31, 1966.

Solomon M. Cheser, New York City
(Tell, Cheser, Werner & Breitbart, Ben-

jamin L. Tell, New York City), for appellant, Boston Ins. Co.

William R. Glendon, New York City (Royall, Koegel & Rogers, David W. Bernstein, New York City, of counsel), for appellee, F. Ralph Nogg, trustee in reorganization of Yale Express System, Inc. and subsidiaries.

Richard V. Bandler, Asst. Regional Adm., Philip A. Loomis, Jr., Gen. Counsel, David Ferber, Sol., Martin D. Newman, Atty., Washington, D. C., Sidney Lapidus, Atty., New York City, for appellee, Securities and Exchange Commission.

John M. Friedman, New York City, for appellee, Empire Trust Co.

Before FRIENDLY and HAYS, Circuit Judges, and CLARIE, District Judge.* ·

FRIENDLY, Circuit Judge:

This appeal from an order of Judge Tyler in the Chapter X proceedings of Yale Express System, Inc., in the Southern District of New York, raises interesting questions of the rights of a surety in bankruptcy, some of which are only dimly illumined by the case law.

The debtor Yale Express, a motor carrier certificated under the Interstate Commerce Act, was insured by Boston Insurance Company against liability for loss or damage to cargo under policies requiring Yale to pay the first $5000 of each claim. The basic policy contained an endorsement, obtained by Yale in order to effect compliance with ICC regulations under § 215 of the Act, 49 C.F.R. § 1741 (b), whereby Boston undertook to pay any shipper or consignee for all loss or damage to property coming into Yale's possession for which the carrier might be held legally liable, up to a maximum of $2000 in respect of loss or damage occurring at any one time and place and of $1000 in respect of loss or damage to property carried on any one motor vehicle. The endorsement was to apply "irrespective of the financial responsibility or lack thereof or insolvency or bankruptcy of the insured," but Yale agreed to reimburse Boston "for any payment that the Company would not have been obligated to make under the provisions of the policy, except for the agreement contained in this endorsement."

At the filing of the Chapter X petition Yale had some 22,000 pending claims for cargo loss and damage, many of which were asserted by shippers owing freight charges. The trustee promptly notified all claimants that because of the Chapter X proceedings Yale could make no payments on pre-petition claims save as part of a plan of reorganization but that Boston was obligated to pay them directly at least up to $1000. When claims began to be filed against Boston, it sent the shippers letters indicating willingness to honor their claims after processing by the debtor but asserting its right to deduct any outstanding freight. At the same time employees of Yale were informing claimants that all freight charges had to be paid to it within the credit period. Fearing this conflicting advice would impair his efforts to retain or win back the custom of the claimants, the then trustee negotiated an arrangement with Boston and petitioned the district court *ex parte* for its approval. The arrangement, which applied only to claims payable by Boston under the endorsement, provided that Boston would stop sending letters to the claimants asserting the right to set off unpaid freight; that in paying for cargo loss or damage Boston would deduct outstanding freight charges, informing the shipper that the debtor had set off the receivable against the cargo claim; and that the debtor would pay to Boston any freight collected from the shipper after the date of the arrangement and before the cargo claim was processed. The judge denied the trustee's application but, on the petition of Boston, reheard the matter on notice to all parties; at that hearing the trustee reversed his previous position. The judge concluded that Boston was not entitled to reduce liability to claimants under the endorsement by setoff of freight owing to the debtor and that in any event it would be

---

* Of the District of Connecticut, sitting by designation.

improvident to allow such extensive depletion of the debtor's cash resources.

In order to succeed on appeal Boston must establish:

(1) That it stood as a surety for Yale with respect to the claims here in question;

(2) That as a surety it was equitably entitled to require deduction of freight owing to Yale;

(3) That this equitable right should be recognized in bankruptcy; and

(4) That enforcement of the right would not unduly interfere with the rehabilitative objective of the Chapter X proceeding.

We hold that Boston has established the first three propositions, and that a further hearing is required because the judge acted on a mistaken assumption in considering the fourth.

■■■ We conclude swiftly but surely that Boston was a surety to Yale for the claims payable solely under the endorsement. "Suretyship is the relation which exists where one person has undertaken an obligation and another person is also under an obligation or other duty to the obligee, who is entitled to but one performance, and as between the two who are bound, one rather than the other should perform." ALI, Restatement, Security § 82. Both Yale and Boston are obligated to the shipper, and Yale's promise to reimburse Boston for any payments made solely by virtue of the endorsement shows that it rather than Boston is the principal who "should perform." Id. at 230.[1] It is of no moment that a claimant can proceed directly against Boston; suretyship relations are not confined to cases where "the creditor's assertion of his right against the surety must be postponed until some action is taken against the principal. So far as the creditor is concerned, the surety may be the primary obligor." Id. at 230. The fact that the premiums covered payment for Boston's undertaking under the endorsement does not mean that Boston was not a surety; it means only that it was a compensated one. These controlling rules are so elementary and their fit to the facts so perfect that further citation or development of this point would be supererogation.

■■■ It is equally well settled that "where the duty of the principal to the creditor is fully satisfied, the surety to the extent that he has contributed to this satisfaction is subrogated * * * to the interests which the creditor has in security for the principal's performance and in which the creditor has no continuing interest." Restatement, Security § 141. The claimants' power to satisfy their damage claims in whole or in part by deducting their liability for unpaid freight[2] was security of the most perfect kind. To be sure, it is generally held that so long as the principal is solvent and thus able to respond to a claim for exoneration, "a surety cannot compel him to assert a counterclaim in the surety's exoneration, nor can the surety use it himself, when sued." United States ex rel. Johnson v. Morley Const. Co., 98 F.2d 781, 789 (2 Cir. 1938), see Meeker v. Halsey, 87 F.2d 299, 301 (2 Cir. 1937); 4 Williston, Contracts § 1251 (Rev. ed. 1936). But when the principal is insolvent, the surety may set off the principal's claim, Clark Car Co. v. Clark, 48 F.2d 169 (3 Cir. 1931); Restatement, Security § 133(2) (c), or obtain a decree requiring the creditor and the principal to adjust their controversies, remaining liable to the creditor only for the amount not covered by the principal's

1. Boston's position under the endorsement differs wholly from its status with respect to claims exceeding $5000; as to the latter it is an indemnitor and insofar as any suretyship relation may exist, Yale, not Boston, is the surety. Restatement, Security § 82, 236–39.

2. Appellees have cited no authority to support the intimation made by Yale to the claimants that the Interstate Commerce Act forbids off-setting damage claims against freight charges. The contrary seems to be established. Chicago & N. W. Ry. v. Lindell, 281 U.S. 14, 50 S.Ct. 200, 74 L.Ed. 670 (1930); Johnson Motor Transp. v. United States, 149 F.Supp. 175, 137 Ct.Cl. 892 (1957).

claim against him. Scholze v. Steiner, 100 Ala. 148, 14 So. 552 (1893); Armstrong v. Warner, 49 Ohio St. 376, 31 N.E. 877, 17 L.R.A. 466 (1892); St. Croix Timber Co. v. Joseph, 142 Wis. 55, 124 N.W. 1049 (1910). Judge L. Hand explained the rationale in the Morley case:

> "If the creditor then recovers from the surety, the surety has no recourse over against the principal, but must bear the loss except for such dividends as he may get in the insolvency proceedings. Yet having recovered from the surety and realized upon his claim, the creditor is without set-off when sued on the counterclaim by the principal's trustee or receiver, and the recovery goes to swell the estate. Had the creditor not sued the surety, he could, and of course would, have used the claim as a set-off against the counterclaim. Thus, the upshot of denying the surety a right to assert the counterclaim is to enhance the principal's estate at the expense of the surety, which is contrary to the fundamental relation between the two. The truth is that after insolvency the counterclaim becomes the creditor's security for his own claim, a means by which it can be paid dollar for dollar through his right of set-off. However, it is only after the surety pays the creditor that he is subrogated to all the creditor's securities, and that would be a condition here, except that the surety cannot pay the debt without losing the security, for it consists only of the creditor's power to defeat the counterclaim by using his claim to cancel it. Therefore to exact of the surety the normal condition of paying the debt, would be to destroy the security, and it follows that he must be allowed to set it up himself." [3] 98 F.2d at 790.

The trustee contends, and the district court held, that whatever the rule may be in other types of insolvency proceedings, Boston was not entitled to relief in bankruptcy since the Bankruptcy Act § 68 allows the setoff only of "mutual" debts and credits,[4] and Boston was endeavoring to set off Yale's claims against the shippers against the shippers' claims against Boston. The argument, however, overlooks the surety relationship and fails to recognize that the debts owed by Boston under the endorsement are really those for which Yale is principally liable. What Boston is in fact asserting is that as a surety it is equitably entitled to require the trustee to require the shippers to apply their security, to wit their indebtedness for freight, for Boston's benefit in the only way in which this particular form of security can be applied, by reducing the claims against both principal and surety. This equitable right of the surety may be viewed either as one to have the creditor required to do what his self-interest would lead him to do but for the existence of the surety, or as one to have the estate of the insolvent principal required to make the setoff available to the surety. In the latter aspect it has all the characteristics of an equitable lien. Cf. Pearlman v. Reliance Ins. Co., 371 U.S. 132, 135–136, 83 S.Ct. 232, 9 L.Ed. 2d 190 (1962).

We perceive no valid reason why this equitable right should not be recognized in bankruptcy. The Bankruptcy Act does not purport to be a complete code; as was noted years ago, it "follows the conservative course of saying as little as possible about suretyship questions." McLaughlin, Amendment of the Bankruptcy Act, 40 Harv.L.Rev. 583 (1927). Its silence on that score does not mean that the rules of suretyship are inapplicable in bankruptcy; courts

---

**3.** One might add that the purpose of the rule conditioning subrogation on full payment by the surety is to protect the creditor against a competing claim by the surety against the principal; there is no occasion to insist on this when a setoff available to the creditor will insure full payment.

**4.** Section 68 provides:
"In all cases of mutual debts or mutual credits between the estate of a bankrupt and a creditor the account shall be stated and one debt shall be set off against the other, and the balance only shall be allowed or paid."

are expected to use general principles of law to fill the gaps, as the Supreme Court did in the *Pearlman* case. Speaking more generally, the Court has said: "A bankruptcy court is a court of equity, § 2, * * * and is guided by equitable doctrines and principles except in so far as they are inconsistent with the Act." SEC v. United States Realty & Improvement Co., 310 U.S. 434, 455, 60 S.Ct. 1044, 1053, 84 L.Ed. 1293 (1940); see also Pepper v. Litton, 308 U.S. 295, 303–311, 60 S.Ct. 238, 84 L.Ed. 281 (1939); Cumberland Glass Mfg. Co. v. DeWitt & Co., 237 U.S. 447, 455, 35 S.Ct. 636, 59 L. Ed. 1042 (1915); In re Evergreen Memorial Park Ass'n, 308 F.2d 65, 69 (3 Cir. 1962). We see no inconsistency in applying in bankruptcy the equitable principle that the surety of an insolvent debtor is entitled to have a creditor apply a debt owing to the debtor to satisfaction of his claim, which the creditor would do as a matter of course but for his right to pursue the surety. A prime purpose of the equitable principle of subrogation is to deny a creditor "the power of throwing the ultimate payment of the debt in one way or another as suits his caprice." 4 Williston, Contracts § 1265, at 3620 (Rev. ed. 1936). The underlying theory that a debt should be discharged "by the one who in good conscience ought to pay it," Restatement, Security § 141, at 384, suggests even more strongly that the principal should not be able to increase the surety's burdens by urging the creditor to proceed against him. Here, the claimants presumably would have deducted unpaid freight from the cargo claims if the trustee had not invited them to proceed directly against Boston, and would have done so even then had Boston continued its letter writing. If the trustee wanted Boston to stop telling the claimants to deduct the unpaid freight, it was fair that Boston be kept in the same position as though it had continued doing what it was entitled to do. Thus, had this been an ordinary bankruptcy, it would have been error to deny the applications for setoff.

Unlike ordinary bankruptcy, whose objective is a fair distribution of assets among creditors, this was a proceeding for reorganization which was aimed at rehabilitation, possibly with all claims ultimately paid in full. See 6 Collier, Bankruptcy ¶ 1.05[4] (14th ed. 1965). The general provisions of the Bankruptcy Act apply under Chapter X only "insofar as they are not inconsistent or in conflict" therewith, § 102. In Lowden v. Northwestern Nat'l Bank & Trust Co., 298 U.S. 160, 164, 56 S.Ct. 696, 698, 80 L.Ed. 1114 (1936), a railroad reorganization under § 77, the Court said that § 68, granting the right of setoff, did not "control the disposition of the controversy *ex proprio vigore*. It governs, if at all, by indirection and analogy according to the circumstances"— among these that "the trustees must have the power to gather in the assets and keep the business going." Relying on that statement the Third Circuit, in a Chapter X proceeding where the reorganization trustees needed cash to keep the business alive, refused to allow a bank to set off an unmatured note against deposits made in the ordinary course of business. Susquehanna Chem. Corp. v. Producers Bank & Trust Co., 174 F.2d 783 (3 Cir. 1949) (Goodrich, J.). See also Lowden v. Northwestern Nat'l Bank & Trust Co., 84 F.2d 847, 853–855 (8 Cir ), cert. denied, 299 U.S. 583, 57 S.Ct. 109, 81 L.Ed. 430 (1936). Our decision in Tyler v. Marine Midland Trust Co., 128 F.2d 927, 928 (2 Cir. 1942), although taking a less expansive approach, also recognized that under the *Lowden* case denial of setoff might be appropriate in reorganization proceedings. This seemingly harsh course of not permitting a creditor in a reorganization to exercise a right that would have been available in ordinary bankruptcy may be justified on the ground that the immediate sacrifice can be compensated—if the proceeding is successful—by appropriate recognition in a plan of reorganization. See In re New York, N. H. & H. R. R., 147 F.2d 40, 47–48, 53 (2 Cir.), cert. denied, 325

U.S. 884, 65 S.Ct. 1577, 89 L.Ed. 1999 (1945).[5] If a right expressly accorded by statute in ordinary bankruptcy may be thus suspended or denied in the interests of achieving a reorganization, cf. In re Fleetwood Motel Corp., 335 F.2d 857, 862 (3 Cir. 1964), a right so recognized only pursuant to general principles of equity can stand on no firmer ground.

Judge Tyler found that "although the present financial position of the debtor and its subsidiaries cannot be measured with accuracy, it seems clear that to compel the trustee to pay as much as $4,000,-000 or even $2,000,000 at a time when he has been obliged to borrow to date upon authorized certificates of indebtedness the total sum of $950,000 for current operating expenses would be an improvident step for this reorganization court to take." Boston says that the figures cited by the judge are its rough estimate of the total cargo claims payable by it, that the freight charges to be set off are con-siderably less—only, as it contends, some $200,000 to $250,000, and that protection against frustrating the reorganization could be achieved by setting a limit on the amount to be presently made available for setoff. Although the record does show that the million dollar figures related to the total claims and must therefore be too high, it sheds no light on the amount of the freight charges that ought to be set off, and we cannot tell what the judge might say if it did. Thus, in addition to being uncertain how far the judge's attitude toward the setoff was influenced by what we consider mistaken views on the legal merits of Boston's claim, we are unable to determine whether even a limited setoff would be compatible with the requirements of the reorganization or what limits would be appropriate. We therefore vacate the order and remand for further consideration in the light of this opinion.

Order vacated and cause remanded. No costs.

5. Indeed Boston might argue that it is entitled to preferred treatment in a plan for all payments to claimants, at least where the claims accrued within six months of the filing of the petition. Although § 115 of the Bankruptcy Act does not make the rule of Fosdick v. Schall, 99 U.S. 235, 25 L.Ed. 339 (1879), applicable in Chapter X so clearly as § 77 (b) does in railroad reorganizations or the previous § 77B–b(10) did in other reorganizations, see In re Chicago Express, Inc., 332 F.2d 276, 278 and n. 1 (2 Cir.), cert. denied, 379 U.S. 879, 85 S.Ct. 146, 13 L.Ed.2d 86 (1964), we have held that the rule may apply in Chapter X proceedings of "public service companies." Dudley v. Mealey, 147 F.2d 268, 271 (2 Cir.), cert. denied, 325 U.S. 873, 65 S.Ct. 1415, 89 L.Ed. 1991 (1945); see In re Third Avenue Transit Corp., 138 F.Supp. 623, 626 (S.D.N.Y.1955), aff'd, 230 F.2d 425 (2 Cir. 1956); but see In re North Atlantic & Gulf S.S. Co., 200 F. Supp. 818, 820–822 (S.D.N.Y.1962), aff'd without discussion of this point sub nom. Schilling v. McAllister Bros., 310 F.2d 123 (2 Cir. 1962). What is more doubtful is how far the "six months rule" in-cludes damage claims. Contrast In re Chicago, R. I. & P. Ry., 90 F.2d 312, 316, 113 A.L.R. 487 (7 Cir. 1937), with In re New York, N. H. & H. R. R., 92 F.2d 428, 114 A.L.R. 1151 (2 Cir. 1937), Annett v. New York, N. H. & H. R. Co., cert. denied, 303 U.S. 650, 58 S.Ct. 746, 82 L.Ed. 1110 (1938), and the receivership cases cited in the latter opinion 92 F.2d at 430; see generally Cutcheon, Recent Developments in Federal Railroad Foreclosure Procedure, in Some Legal Phases of Corporate Financing, Reorganization and Regulation, 105–10 (1931); FitzGibbon, The Present Status of the Six Months' Rule, 34 Colum.L. Rev. 230 (1934). In the New Haven Railroad reorganization now pending in the District Court for Connecticut, the debtor and later the trustees were authorized to pay all claims for or arising out of loss, damage or delay to freight or baggage regardless of when accrued, Docket No. 30226, Order No. 1, ¶ (3) (d), Order No. 20; the thought, rather obviously, was that it was better for all creditors to prefer these customers than to lose their business to rival carriers.