In The Matter Of George T. LaBONNE, Jr., Debtor.

Gilbert L. ROSENBAUM, Trustee of the Estate of George T. LaBonne, Jr., Debtor, Plaintiff,

v.

INSURANCE MANAGEMENT CORPORATION, Defendant.

Bankruptcy No. 2–80–00505.
Adv. No. 2–85–0134.

United States Bankruptcy Court, D. Connecticut.

Aug. 25, 1986.

**484**

F. Timothy McNamara, Hartford, Conn., for plaintiff.

Rolland Castleman, Lessner, Castleman & Falkenstein, P.C., Manchester, Conn., for defendant.

## MEMORANDUM OF DECISION

ROBERT L. KRECHEVSKY, Chief Judge.

### I.

Prior to filing a chapter 7 petition on May 20, 1980, George T. LaBonne, Jr., the debtor, had brought suit in the United States District Court for the District of Connecticut against Insurance Management Corporation (IMC). In his action the debtor alleged that IMC had guaranteed the performance by Jones-Mulvihill Company (JMC) of its obligations as an employer under an employment contract with the debtor and that the contract had been breached by JMC, and the debtor claimed money damages. F. Timothy McNamara, Esq., as special counsel for the chapter 7 trustee, Gilbert L. Rosenbaum, Esq., continued to prosecute this claim in the district court postpetition. The parties reached a partial settlement of the litigation in the district court during 1985 under which the debtor's estate received a payment of approximately $157,000.00. The district court, on July 24, 1985, transferred the proceeding to the bankruptcy court to resolve the remaining contention of IMC that it was entitled to set off two certain sums against the balance due under the employment contract. The present proceeding involves that resolution.[1] The following

statement of facts is based upon evidentiary hearings held on June 26 and July 3, 1986.

### II.

Prior to May 29, 1975, the debtor operated an insurance agency under the name of G.T. LaBonne and Associates, Inc. (Associates). Associates was a wholly-owned subsidiary of GTLA, Inc. (GTLA), and the debtor was the controlling shareholder of GTLA. At that time, JMC, a wholly-owned subsidiary of IMC, was seeking to expand its property and casualty insurance business. William B. Graham, the president of IMC, approached the debtor and the two parties negotiated the purchase of Associates' business.

On May 29, 1975, a sale and purchase agreement, drafted by IMC, was signed by Associates as seller, GTLA as seller's sole stockholder, JMC as buyer, and IMC as guarantor of the buyer's obligations. The sale and purchase agreement described the assets being acquired by JMC as follows:

(i) All insurance accounts, expirations, renewal rights, expiration data, and expired dailies (hereinafter referred to collectively as "expirations") as of [May 29, 1975];

(ii) All of Seller's goodwill with respect to its property and casualty insurance agency business;

(iii) All of Seller's office furniture, fixtures, equipment, supplies, and miscellaneous insurance records not heretofore mentioned, such items being listed in the Bill of Sale attached hereto as Exhibit "A".

The purchase and sale agreement also required Associates and GTLA to enter into a non-compete agreement with JMC. JMC agreed to pay to Associates the sums of $40,000.00 for the expirations, $20,000.00 for goodwill, and $5,000.00 for the furniture and equipment. JMC further agreed to pay $35,000.00 to Associates and GTLA

---

1. Both parties have filed a written consent to the entry of a final judgment by the bankruptcy court, pursuant to 28 U.S.C. § 157(c)(2).

as consideration for their non-compete agreement.

On the same date, the debtor and JMC entered into a written employment contract. JMC hired the debtor for a term of nine years to promote the business of JMC and agreed to pay him a salary of $50,-000.00 during his first year of employment, and a minimum annual salary of $40,000.00 thereafter. The debtor and IMC generally concur that the employment contract dated May 29, 1975, did not accurately reflect the full understanding of the parties. That understanding was contained in a letter, dated June 2, 1975, written by the debtor to Graham in which the debtor stated that the period of time over which he would receive his annual salary of $40,000.00 depended upon "the production of commission income from my agency for the one-year period following closing, i.e., May 29, 1975 through May 28, 1976." He set out two columnar tables, one entitled "Net Commission Income" for the one-year period, and the other entitled "Compensation", indicating the total compensation corresponding to each level of net commission income. The letter stated: "For example, if the net commission income is $330,000.00, then I will receive total additional compensation of $40,000 a year for eight years." The letter did not define "net commission income."

During 1977, the debtor and Graham had a disagreement over the total amount of compensation to be paid the debtor. The debtor calculated the net commission income over the one-year period to be approximately $360,000.00, and Graham contended the amount was approximately $315,000.00. The main area of difference was whether commissions generated during the one-year period by independent brokers associated with JMC ("brokered accounts"), as contrasted with commissions generated by JMC employees ("owned accounts"), should be included in the computation of net commission income. The debtor had included in his computation of net commission income commissions from brokered as well as owned accounts, while Graham contended only commissions from owned accounts

should be counted. On April 25, 1978, the debtor, JMC (whose name had been changed to LaBonne, Jones-Mulvihill, Inc. (LJM)), and IMC executed a new agreement (settlement agreement) to resolve these differences. The parties stipulated that the total amount of compensation due the debtor for the employment contract term, June 1, 1976, through November 30, 1982, was $261,160.00, to be paid at the annual rate of $40,000.00. As part of the settlement agreement, the debtor substituted a promissory note for $28,333.22, dated April 25, 1978, and payable to LJM, for a partially-satisfied $40,000.00 like note that the debtor had executed on June 1, 1975.

Several months after the execution of the settlement agreement, IMC contested the debtor's entitlement to the agreed amount of $261,160.00. The dispute involved the inclusion in net commission income of commissions generated by policies sold by John F. Perry, an independent broker associated with JMC during the one-year period in question. The debtor thereafter commenced his breach of contract action in the district court.

### III.

The issues as presented by the parties (but not entirely by the pleadings) are whether IMC is entitled to set off from the monies due the estate (1) the amount of debtor's compensation based on commissions attributable to policies sold by John F. Perry, and (2) the principal balance of $12,629.00 plus unpaid interest due to LJM on the debtor's note of April 25, 1978.

### A.

The first issue is resolved by the provisions of the April 25, 1978, settlement agreement. The preamble of the settlement agreement states: " ... a disagreement has arisen among the parties as to the amount of compensation to be paid to LaBonne by LJM under their May 29, 1975 Employment Agreement and the parties believe that it is in their best interests to settle this disagreement on the terms set

forth below". These terms are unambiguous. The total compensation to be paid to the debtor by LJM was fixed at $261,-160.00, and, accordingly, the employment termination date was set at November 30, 1982. The debtor waived all claims against LJM and IMC for any further compensation. There is no mention in the original employment contract, the letter, or the settlement agreement of brokered or owned accounts. The settlement agreement was drafted by IMC, and IMC makes no claim of duress, deception, fraud, or overreaching during the negotiation of the settlement agreement. Under these circumstances, IMC cannot assert a setoff based on its claim of miscalculation of the compensation. "When the parties to a controversy compromise and fairly agree on the amount due, ... [the agreement] will be binding upon them, and the [defendant], when sued upon it, cannot utilize a defense which would have been available in a suit upon which the compromise agreement was founded." *Azzolina v. Sons of Italy*, 119 Conn. 681, 690, 179 A. 201 (1935). A settlement obtained in the absence of fraud or coercion is as conclusive on the parties as a judgment. *Allen v. Alabama St. Bd. of Educ.*, 612 F.Supp. 1046, 1050 (M.D.Ala. 1985). If, in fact, the agreed-upon amount resulted from a misunderstanding by IMC concerning the John F. Perry accounts, that is of no avail to IMC. A unilateral mistake of fact is not a basis for avoidance of a settlement agreement. *Mid-South Towing Co. v. Har-Win, Inc.*, 733 F.2d 386, 392 (5th Cir.1984).

### B.

The remaining issue is whether IMC can set off the debt owed by the debtor to IMC's subsidiary, LJM, against the monies due from IMC to the debtor. I hold that it may do so. Section 553 of the Bankruptcy Code provides in pertinent part that "this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose [prepetition] against a claim of such creditor against the debtor that arose [prepetition]...." Section 553 does not create a right of setoff, it merely recognizes the existence of such a right under state law and imposes restrictions on its application. 4 *Collier on Bankruptcy* ¶ 553.02 (L. King 15th ed. 1986). The first question is whether state law permits IMC to set off the LJM debt.

Generally, when a creditor sues a surety or guarantor without joining a solvent principal, the surety cannot plead a claim in setoff that belongs solely to the principal. *Boston Ins. Co. v. Nogg (In re Yale Express System, Inc.)*, 362 F.2d 111, 114 (2d Cir.1966). One exception to this rule allows such use of setoff when the principal has assigned its claim to or consented to its use by the surety. Restatement, Security § 133(2)(a). Where the guarantor controls the principal, consent will be presumed. *Bloor v. Shapiro*, 32 B.R. 993, 1001 (S.D.N.Y.1983). As the principal here, LJM, is a wholly-owned subsidiary of IMC, the presumption of consent applies in this proceeding.

Even without a presumption of consent, equitable principles would entitle IMC to setoff of the LJM debt. In addition to the fact that LJM is a wholly-owned subsidiary of IMC, the note payable to LJM was executed in connection with the settlement agreement in which IMC guaranteed the performance of LJM's obligations. If the debtor had sued both LJM and IMC, the two debts clearly would have been set off against each other. To disallow such setoff when only the guarantor, parent of the principal, is sued would be to ignore the realities of the transactions in question. Connecticut courts would surely allow equitable setoff on these facts. *See Savings Bank of New London v. Santaniello*, 130 Conn. 206, 210–11, 33 A.2d 126 (1943).

Nothing in § 553 changes this result. While § 553 allows setoff only of mutual debts and credits, the monies due the debtor from IMC are those for which LJM is principally liable. The "mutual debts" requirement is satisfied here. *See In re Yale Express, supra*, 362 F.2d at 115.

## IV.

Judgment may enter that Insurance Management Corporation may set off the sum of $12,629.00, plus accrued interest, against the monies otherwise due the debtor's estate.

This Memorandum shall constitute Findings of Fact and Conclusions of Law mandated by Bankruptcy Rule 7052.