**FORD MOTOR COMPANY, Plaintiff and Counter-Defendant,**

v.

**TRANSPORT INDEMNITY COMPANY, a California corporation and the Central National Insurance Company of Omaha, Nebraska, a Nebraska corporation, Defendants and Counter-Plaintiffs,**

v.

**AUTOMOBILE TRANSPORT, INC., a Michigan corporation, and Alexander Andrews, Trustee in Bankruptcy of Automobile Transport, Inc., Additional Defendants on Counterclaim.**

**In re AUTOMOBILE TRANSPORT, INC., Debtor.**

**Alexander G. ANDREWS, Plaintiff-Trustee for Automobile Transport, Inc., Plaintiff and Counter-Defendant,**

v.

**FORD MOTOR COMPANY, a Michigan corporation, Defendant and Counter-Plaintiff.**

Civ. A. No. 80–60066.
Bankruptcy No. 9–04232–P.
Adv. No. 81–1957.

United States District Court, E.D. Michigan, S.D.

June 28, 1984.

[Black bar]

---

George E. Ward, Kauffman, Roche & Ward, Detroit, Mich., for plaintiff and counter-defendant.

Milton Lucow, Garan, Lucow, Miller, Lehman, Seward, & Cooper, William B. Calcutt, Cross, Wrock, Miller & Vieson, Detroit, Mich., John G. Makris, Troy, Mich., for defendants and counter-plaintiffs.

## MEMORANDUM OPINION AND ORDER

JOINER, District Judge.

This case is before the Court on defendant Transport Indemnity Company's (TICO) Motion to Dismiss, plaintiff Ford's motion to amend the complaint, and Ford's motion for summary judgment. For the reasons stated herein, TICO's motion to dismiss is denied, and Ford's motions to amend and for summary judgment are granted.

## FACTS

Defendant Automobile Transport, Inc. (ATI) was a commercial hauler of newly manufactured automobiles. In this capacity, it hauled cars by truck for Ford between manufacturing plants and Ford dealerships, where the cars were sold to the retail public. ATI often transported the cars through only a segment of their journey from the factory to the showroom; other portions of the carriage were undertaken by rail carriers or other motor carriers. ATI had entered into agreements with certain of these other motor carriers, which included provisions for pro rata contributions by each of the two carriers towards damage claims made by the dealers when a new car was received in less than factory-mint condition.

ATI, as a motor carrier doing business in interstate commerce, was required under the Interstate Commerce Act, to obtain insurance or other type of security to cover damage to goods that it hauled, 49 U.S.C. § 10927(a)(3).[1] ATI obtained liability insur-

---

1. The statute provides as follows:

(3) The Commission may require a motor common carrier providing transportation under a certificate to file with the Commission a type of security sufficient to pay a shipper or consignee for damage to property of the shipper or consignee placed in the possession of the motor common carrier as the result of transportation provided under this subtitle. A carrier required by law to pay a shipper or consignee for loss, damage, or default for which a connecting motor common carrier is responsible is subrogated, to the extent of the

ance from defendant TICO, which was effective during the periods of April 1975 to February 1979, and from September 1979 until ATI was adjudged bankrupt, in January of 1980. Defendant Central National Insurance Co. (CNI) provided the insurance coverage during the intervening period of February to September of 1979.

Pursuant to § 10927(a)(3) of the Interstate Commerce Act, the Interstate Commerce Commission (I.C.C.) issued its Endorsement for Motor Common Carrier Policies of Insurance for Cargo Liability hereinafter designated as the "I.C.C. endorsement".[2] The I.C.C. endorsement constitutes a supplemental insurance agreement at law, by which the insurer is obligated to pay the shippers of goods, such as Ford, for any loss of or damage to property that results from the transportation of the shipped goods by the insured cargo carrier, up to a specified maximum amount. The I.C.C. endorsement further provides that none of the policy limitations in effect between the insurer and the carrier will affect the liability that runs from the insurer to the shippers under the terms of the endorsement.

The endorsement in effect in this case provided that the insurer would not be liable in excess of $5,000 for any loss of or damage to property carried by a single motor vehicle, nor in excess of $10,000 for any loss of or damage to property occurring at any one time or place. Ford has sought recovery against TICO for its damage claims under the I.C.C. endorsement, and not under the policy of insurance in effect between TICO and ATI, because the insurance policy carried a $25,000 deductible provision, and because the liability established by the I.C.C. endorsement runs directly from TICO to Ford.

Ford initially brought this action against TICO and CNI, but has subsequently settled its claims against CNI. TICO was granted leave to amend its answer to bring a third-party claim against ATI.

Ford seeks recovery on its outstanding damage claims totaling $2,165,008.66. Ford also seeks a set-off of outstanding

---

amount paid, to the rights of the shipper or consignee under any such security.

2. The endorsement appears in Form B.M.C. 32 (Revised), as provided by I.C.C. regulation 49 C.F.R. § 1003.1, and provides in pertinent part as follows:

In consideration of the premium stated in the policy to which this endorsement is attached, the Company hereby agrees to pay, within the limits of liability hereinafter provided, any shipper or consignee for all loss of or damage to all property belonging to such shipper or consignee, and coming into the possession of the insured in connection with such transportation service, for which loss or damage the insured may be held legally liable, regardless of whether the motor vehicles, terminals, warehouses, and other facilities used in connection with the transportation of the property hereby insured are specifically described in the policy or not. The liability of the Company extends to such losses or damages whether occurring on the route or in the territory authorized to be served by the insured or elsewhere.

Within the limits of liability hereinafter provided it is further understood and agreed that no condition, provision, stipulation, or limitation contained in the policy, or any other endorsement thereon or violation thereof, or of this endorsement by the insured, shall affect in any way the right of any shipper or consignee, or relieve the Company from liability for the payment of any claim arising out of such transportation service for which the insured may be held legally liable to compensate shippers or consignees, irrespective of the financial responsibility or lack thereof, or insolvency or bankruptcy of the insured. However, all terms, conditions, and limitations in the policy to which this endorsement is attached are to remain in full force and effect as binding between the insured and the Company. The insured agrees to reimburse the Company for any payment made by the Company on account of any loss or damage involving a breach of the terms of the policy and for any payment that the Company would not have been obligated to make under the provisions of the policy, except for the agreement contained in this endorsement.

The liability of the Company for the limits provided in this endorsement shall be a continuing one notwithstanding any recovery hereunder. The Company shall not be liable for an amount in excess of $5,000 in respect to all losses or damages to property hereby insured carried on any one motor vehicle, nor in any event for an amount in excess of $10,000 in respect to any loss of or damage to or aggregate of losses or damages of or to such property occurring at any one time and place.

freight charges which it owes to ATI (or more appropriately, to ATI's trustee in bankruptcy). Finally, Ford seeks in its motion for summary judgment a declaration from this court of the manner in which Ford's unprocessed claims against ATI will be verified. Prior to filing its petition in bankruptcy, ATI had processed and verified over $1,725,000 in damage claims. Further, ATI had drafted checks payable to Ford for those claims, but never delivered the checks, presumably because it lacked sufficient funds. ATI has not yet processed the remaining claims, totaling more than $655,000. It is against those unprocessed claims that Ford seeks a set-off of its unpaid freight charges.

## DISCUSSION

### TICO's Motion to Dismiss

The complaint in this case was filed on October 22, 1980. Paragraph 4 stated that jurisdiction of the Court was predicated upon 28 U.S.C. § 1332 (the general diversity statute) and 49 U.S.C. § 11707, a provision of the Interstate Commerce Act. Presumably, plaintiff sought to establish general federal question jurisdiction under 28 U.S.C. § 1331.

TICO filed its answer to the complaint on November 21. Although it denied generally the jurisdictional statement in paragraph 4 of the complaint, TICO stated in paragraph 8 of the answer that ATI was liable to Ford for the damage claims, and not TICO. In paragraph 9, TICO stated that

ATI is subject to service of process, and joinder of ATI would not deprive the court of jurisdiction over the subject matter of this action.

Plaintiff reads these portions of TICO's answer to indicate that TICO has acknowledged the existence of this court's jurisdiction in this case. The two paragraphs, read side by side, are difficult to reconcile,

but the court will presume that TICO denied the existence of jurisdiction in paragraph 4, but pled in the alternative that if such jurisdiction existed, that ATI was a necessary party to this action.

Ford next argues that this motion is untimely. Rule 12(b) of the Federal Rules of Civil Procedure provides that a motion making any of the defenses enumerated under that subsection, including a motion to dismiss on the grounds of lack of jurisdiction over subject matter, "shall be made before pleading if a further pleading is permitted." Although 12(b) motions must generally be made before the filing of an answer, the courts have permitted defendants to bring challenges to the court's subject matter jurisdiction following submission of the answer, *see Phillipine Airlines, Inc. v. National Mediation Board*, 430 F.Supp. 426, 427 at n. 1 (N.D.Cal.1977). Although this type of motion is particularly untimely, in light of the history of this case, the court concludes that it presents sufficiently important issues to require resolution on the merits. Nonetheless, denial of the motion on the grounds of untimeliness would not have been inappropriate in this case, considering the late hour at which the issues were raised.

### Diversity Jurisdiction

Ford is a Delaware corporation with its principal place of business in Michigan. TICO is a California corporation with its principal place of business in that state, so diversity would ordinarily be present between these parties. TICO argues that, because this is an action brought by the beneficiary of a policy of insurance against the insurer, it is governed by 28 U.S.C. § 1332(c),[3] which provides in essence that an insurer is deemed to be a resident of the same state of its insured in actions in which

---

3. That statute provides as follows:

(c) For the purposes of this section and section 1441 of this title, a corporation shall be deemed a citizen of any State by which it has been incorporated and of the State where it has its principal place of business: *Provided further,* That in any direct action against the insurer of a policy or contract of liability insurance, whether incorporated or unincorporated, to which action the insured is not joined as a party-defendant, such insurer shall be deemed a citizen of the State of which the insured is a citizen, as well as of any State by which the insurer has been incorporated and of the State where it has its principal place of business.

jurisdiction is predicated upon the diverse citizenship of the parties. ATI is a Michigan corporation, and there is no diversity of citizenship between it and Ford. If TICO is deemed to be a citizen of Michigan by operation of § 1332(c), then diversity would be absent from this case. TICO argues that this case is controlled by *Ford Motor Co. v. Insurance Co. of North America*, 669 F.2d 421 (6th Cir.1982), in which the Court of Appeals concluded that § 1332(c) applied to an action brought by Ford, coincidentally the plaintiff in that action, against defendant insurer, who had issued a policy of automobile insurance that was governed by Michigan's No Fault statute. TICO argues that the no fault insurance statute imposes a similar kind of contract at law upon insurers as that created by the I.C.C. endorsement, on which Ford is seeking to recover in this case.

■ Although TICO's position is not without merit, the Court concludes that the I.C.C. endorsement creates a surety relationship between the insurer, the shipper, and the carrier, as opposed to an indemnity relationship normally contemplated by an insurance contract, *see In re Yale Express*, 362 F.2d 111, 114 (2d Cir.1966) (Friendly, J.). Further, this Court agrees with the reasoning and conclusion reached in *A.J. Kellos Construction Co. v. Balboa Ins. Co.*, 495 F.Supp. 408 (S.D.Ga.1980). That court concluded that § 1332(c) did not operate in an action brought against a surety, as opposed to an indemnitor.[4] The courts in both *In re Yale Express, supra*, and *A.J. Kellos, supra*, relied upon § 82 of the Restatement of Security[5] in coming to the conclusion that the relationship between the parties was appropriately characterized as one of suretyship as opposed to indemnification.

■ In this case, the key language of the I.C.C. endorsement provides as follows:

**4.** The *A.J. Kellos* court concluded that, because the defendant's obligation under the bond was contingent upon the default by the principal of a contractual undertaking, the defendant was properly regarded as a surety and not as an indemnitor. The court reasoned as follows:

> Consonant with suretyship, Balboa's obligation under the bond executed in favor of Kellos was contingent on the default of the principal Roofing Specialists, Inc.—an undertaking distinct from indemnity. The relationship, therefore may not properly be characterized as a contract that indemnifies against the condition of becoming liable. Thus, in the terminology of the section 1332(c) proviso, the bond may not be defined as a contract of liability insurance. This conclusion forecloses application of the proviso and renders analysis of the direct action requirement unnecessary.

495 F.Supp. at 413 (citation omitted).

**5.** That section provides as follows:

> § 82. SURETYSHIP DEFINED.
>
> Suretyship is the relation which exists where one person has undertaken an obligation and another person is also under an obligation or other duty to the obligee, who is entitled to but one performance, and as between the two who are bound, one rather than the other should perform.

The official comments to Section 82 distinguishes contracts of indemnity from those of surety as follows:

> 1. *Indemnity.* A contract of indemnity is one where the promisor agrees to save a promisee harmless from some loss, irrespective of the liability of a third person. In this sense, indemnity is synonymous with insurance.
>
> The indemnitor, upon the happening of the stipulated contingency, is liable whether or not the indemnitee has any recourse against a third person. In suretyship the normal expectation is that the liability will be satisfied by the third person. Indemnity contemplates two parties, at least at the time of making the contract. Suretyship always involves three parties.
>
> Indemnity in general is of two sorts. In the first, only two parties are involved at any stage of the proceedings. For example, an insurance company insures an automobile owner against any liability he may incur by reason of harm to others in the operation of his car. In the second sort, the indemnitor insures the indemnitee against loss he may incur by reason of accident or the default of another. In this type of indemnity, suretyship may ultimately be involved. For example a company may insure an automobile owner against certain types of harm to his car.
>
> If damage ensues without responsibility of a third person the contract remains only a contract of indemnity. If, however, the damage is one for which a third person who is not protected by the same policy of insurance is liable, the insurer has also become a surety, because between the insurer and the one who causes the harm, the latter should bear the ultimate loss.

The insured agrees to reimburse the Company (the insurer) for any payment made by the Company on account of any loss or damage involving a breach of the terms of the policy *and for any payment that the Company would not have been obligated to make under the provisions of the policy, except for the agreement contained in this endorsement.* (emphasis added).

Ford is attempting to recover on its damage claims only under the endorsement, and not under the policy, which contained an express provision that the first $25,000 of any claim was deductible. Were it not for the endorsement, Ford would have no cause of action against TICO because all individual claims are for less than $25,000. Because the endorsement expressly provides that, as between TICO and ATI, ATI must reimburse TICO for any payments that TICO makes to a shipper which TICO is obligated to make only because of the contract at law imposed by the endorsement, the relationship between TICO and ATI was one of suretyship, and not indemnification, under the terms of the endorsement.[6]

■ The court therefore concludes that § 1332(c) is not applicable to this action, and that TICO's residence is California. Diversity is therefore a proper basis for the court's jurisdiction in this matter.

### Federal Question Jurisdiction

As indicated above, Ford claimed federal question jurisdiction in this action because it was suing under 49 U.S.C. § 11707,[7] commonly known as the Carmack Amendment of the Interstate Commerce Act. Section 11707 establishes liability of common carriers in favor of persons who are entitled to recover under a receipt or bill of lading, which the statute requires the carrier to issue for all goods that it transports.

■ TICO argues that the Court lacks jurisdiction over the claims advanced by Ford in this matter by operation of 28 U.S.C. § 1337(a),[8] which provides in essence that a federal district court has jurisdiction of an action brought under § 11707 only if each receipt or bill of lading in controversy exceeds $10,000. The purpose of § 1337(a) was to divest the federal courts of jurisdiction over small freight claims, *see Pillsbury Co. v. Atchison, Topeka and Santa Fe Railroad,* 548 F.Supp. 28 (D.Kan.1982).

■ Ford seeks to amend its complaint to indicate that this action is brought under 49 U.S.C. § 10927, and not under § 11707. As indicated above, it is the former provision which requires the carrier to obtain liability insurance or other form of security to cover damage to goods that it transports, and which imposes the terms of the I.C.C. endorsement upon the insurer. Section 10927 is in fact the proper substantive provision of the Interstate Commerce Act under which this case should have been brought, because Ford is attempting to re-

---

**6.** The statute that imposes upon the carrier the obligation to obtain insurance or like security, 49 U.S.C. § 10927(a)(3), expressly creates a right of subrogation in favor of the insurer against the carrier, *see* footnote 1, *supra.* Subrogation is of course one of the principal features of a surety relationship, *see* footnote 5, *supra.*

**7.** The pertinent portion of that statute provides as follows:

(a)(1) A common carrier providing transportation or service subject to the jurisdiction of the Interstate Commerce Commission under subchapter, I, II, or IV of chapter 105 of this title shall issue a receipt or bill of lading for property it receives for transportation under this subtitle. That carrier and any other common carrier that delivers the property

and is providing transportation or service subject to the jurisdiction of the Commission under subchapter I, II, or IV are liable to the person entitled to recover under the receipt or bill of lading.

**8.** That statute provides as follows:

(a) The district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies. *Provided, however,* That the district courts shall have original jurisdiction of an action brought under section 11707 of title 49, only if the matter in controversy for each receipt or bill of lading exceeds $10,000, exclusive of interest and costs.

cover under the I.C.C. endorsement, and not pursuant to receipts or bills of lading issued by ATI. TICO has not opposed Ford's motion to amend, and the Court concludes that amendment is proper in this case under the terms of Fed.R.Civ.P. 15(a). Because 28 U.S.C. § 1337(a) imposes no jurisdictional minimum amounts on claims brought under § 10927 of the Interstate Commerce Act, the court concludes that claims brought under the I.C.C. endorsement, as opposed to those brought under the terms of a bill of lading, need not amount to $10,000 each in order to create jurisdiction in this court. The Court concludes that federal question jurisdiction is present in this case under the general federal question statute, 28 U.S.C. § 1331.

■ Further, this court has an alternative statutory source of jurisdiction in 28 U.S.C. § 1352,[9] which provides District Courts with original jurisdiction over any action on a bond executed under any law of the United States. The court concludes that the I.C.C. endorsement involved in this case is a bond required to be executed under the laws of the United States, *cf. Hartridge v. Seaboard Surety*, 74 F.R.D. 6 (E.D.Okla.1976) (bond required to be posted by carriers by operation of 49 U.S.C. § 10927(a)(1) for damage in the form of personal injury, as opposed to damage to goods, created jurisdiction under § 1352).

### Ford's Motion for Summary Judgment

Ford contends that there is no remaining issue of material fact concerning its cargo damage claims. In particular, it asserts that ATI's processing and approval of claims totaling $1,725,351.99 constitutes an admission of liability with respect to those claims. Further, with respect to the re-

maining claims against ATI totaling $655,-693.56, Ford asserts that ATI has failed to raise any defense and would have processed and approved those claims as well had it not gone out of business.

Finally, Ford argues that, because ATI, as principal, has admitted liability on the cargo damage claims submitted by Ford, TICO as surety is bound by those admissions. Consequently, Ford concludes that summary judgment against TICO is appropriate.

■ As noted above, the court agrees that TICO acted as surety for cargo claims that were brought against ATI by shippers under the I.C.C. endorsement, *see In re Yale Express, supra*. Further, it is the rule in this state that a judgment against a principal on a bond is admissible as prima facie evidence of liability of the surety, and shifts the burden to the surety to produce evidence why such liability should not be imposed, *see, P R Post v. Maryland Casualty*, 403 Mich. 543, 271 N.W.2d 521 (1978). Although Ford has not obtained judgment against the principal, ATI, the court concludes that ATI has in fact admitted its liability for the cargo claims, and such admissions have the same effect of establishing a prima facie case against the surety, and shifting the burden to TICO to rebut those claims as would a judgment obtained against TICO.

TICO has raised three separate defenses to the damage claims filed by Ford and accepted by ATI. First, TICO argues that ATI did not carry all of the cars involved in the damage claims across state boundaries, and that the transportation was thus not within interstate commerce so as to be governed by the Interstate Commerce Act and the I.C.C. endorsement.[10] Second,

---

9. At the time of the filing of this lawsuit, § 1352 provided as follows:

> The district courts shall have original jurisdiction, concurrent State courts, of any action on a bond executed under any law of the United States.

It was amended, effective November 1, 1980, in a manner which does not effect the jurisdiction of the Court over this matter.

10. TICO argues that the I.C.C. endorsement does not cover transportation of vehicles entirely within the boundaries of a single state by a single carrier pursuant to a single contract of carriage, or vehicles carried exclusively within "exempt commercial zones". Such a zone is defined by statute as a "municipality, contiguous municipalities, or in a zone that is adjacent to, and commercially a part of, the municipality or municipalities," 49 U.S.C. § 10526(b)(1).

TICO asserts that ATI had entered into agreements with other motor carriers who transported some of the same cars involved in these damage claims during part of their journey from the plants to the dealers. These agreements provided that the different carriers would make pro rata contributions to any damage claims filed with respect to those cars. Thus, TICO argues, Ford is limited in its recovery against ATI to only those portions of its damage claims for which ATI was responsible under the terms of co-carrier agreements. Finally, TICO asserts that Ford failed to give timely notice of a number of its damage claims to ATI under the terms of the Uniform Straight Bill of Lading, which provides that claims brought under such a bill must be made within nine months of the date of delivery of the goods.

 These defenses are all premised on the position that ATI improperly authorized payment of the damage claims, when it should have denied certain claims on the grounds of the three positions outlined above. They are, in effect, affirmative defenses to Ford's claims. As such, they are to be raised in the answer according to Fed.R.Civ.P. 8(c). If not so raised, they are deemed to be waived, *see Senter v. General Motors Corp.*, 532 F.2d 511, 530 (6th Cir.1976) (failure to raise the affirmative defense of the statute of limitations in the answer amounted to waiver of the defense); *Funding Systems Leasing Corp. v. Pugh*, 530 F.2d 91, 96 (5th Cir.1976) (failure to raise an affirmative defense in the initial pleading precludes raising of the defense by way of a motion for summary judgment). *See generally* 2A *Moore's Federal Practice* ¶ 8.27(3) at n. 8.

Because these defenses do not go to the jurisdiction of the court over this matter, there is no compelling reason to permit TICO to raise them now, for the first time, some 3½ years after the complaint and answer were filed in this case. The rule

that an affirmative defense must be pleaded in the answer or waived is designed precisely for a case such as this, in which a plaintiff has expended considerable resources in the prosecution of its case, only to learn at the eve of resolution of that case that defendant will rely upon a legal theory or theories previously unaddressed. The rule promotes the efficient and orderly prosecution of actions, and that policy would be ill served if TICO were permitted to defeat this motion by reliance upon a novel theory that is raised for the first time at this late hour.

Further, the court concludes that, even if the defenses had been properly raised in the answer to the complaint, the first two are lacking in merit and would not satisfy TICO's burden of proof. In particular, the argument that Ford is restricted in its recovery for damage claims against ATI by agreements between ATI and other carriers to which Ford was not a party is entirely spurious. The fact that ATI might have a contractual right to contribution from other carriers for damage claims assessed by Ford against ATI in no way limits Ford's right of recovery against ATI under the Interstate Commerce Act. It is such an elementary principle of contract law that obligations and rights created by the contract are imposed only upon those entities that are parties to the contract that citation to authority would be an exercise in stating the obvious.

Second, with respect to TICO's argument that Ford was required to file its damage claims against ATI within nine months, as provided by the Uniform Straight Bill of Lading, the court reiterates its finding that Ford is proceeding against ATI and TICO in this matter pursuant to its statutory rights of recovery created by § 10927 of the Interstate Commerce Act, and not under any contractual rights created by bills of lading issued by ATI. The statute provides an independent and sufficient source

---

Such a zone, under the definition, could conceivably include portions of different states.

For the purposes of discussion, the court will refer to all transportation that is not subject to

I.C.C. regulation, be it intrastate transportation, or transportation within commercially exempt zones, as "intrastate transportation".

of recovery to Ford which is not limited by the terms of the bills of lading, under which Ford might also have sought to vindicate its damage claims in this matter.

The argument that the I.C.C. endorsement does not apply to an unspecified number of Ford's damage claims which involve only intrastate transportation of certain automobiles is more problematic. TICO has failed to cite the court to a single case involving the jurisdictional scope of the endorsement. Indeed, the court's own research on this matter indicates that there may in fact be very little in the way of relevant authority on this issue.

The pertinent jurisdictional statute is 49 U.S.C. § 10521, which provides in part as follows:

(a) Subject to this chapter and other law, the Interstate Commerce Commission has jurisdiction over transportation by motor carrier and the procurement of transportation to the extent that passengers, property, or both, are transported by motor carrier—

(1) between a place in—

(A) a State and a place in another State.

TICO argues that these provisions should be read to limit the reach of the I.C.C. only to those activities which involve the transportation by a single motor carrier of goods across state lines. In other words, if a carrier undertakes part of the transportation of goods from their initial point of departure in one state to their final destination in another state, that carrier does not transport goods in interstate commerce if it moves those goods only within the boundaries of a single state. TICO argues that this is so notwithstanding the fact that the action of several carriers resulted in the movement of the goods across state lines.

Although the movement of goods through part of their interstate journey would clearly constitute interstate commerce for purposes of the commerce clause of the Federal Constitution, Art. 1, § 8, cl. 3, cf. Wickard v. Filburn, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942) (federal government could regulate sale of wheat that occurred entirely in one state) the

courts have noted that the Interstate Commerce Act "does not purport to regulate all acts and matters indirectly related to interstate transportation by motor carriers," Southern Pacific Transportation Co. v. I.C.C., 565 F.2d 615, 617 (9th Cir.1977). In other words, Congress has not delegated the full extent of its commerce clause regulatory powers to the I.C.C. in matters concerning interstate transportation by motor carriers, but only some portion of those powers. Thus, the fact that Congress could have regulated the transportation at issue in this case does not answer the question of whether or not Congress did in fact empower the I.C.C. to regulate it.

The case of Baltimore & Ohio Southwestern Railroad Co. v. Settle, 260 U.S. 166, 43 S.Ct. 28, 67 L.Ed. 189 (1922) provides guidance. That case involved a dispute between a regulated railroad and several of its shippers. The shippers had sought to divide the transportation of their goods into separate links in order to obtain lower tariffs. They would send their goods from southern points to Oakley, Ohio, a town hard by the Ohio/Kentucky border. From Oakley, the goods would be sent under a separate contract for carriage to Madisonville, Ohio. The rates for transportation between points out-of-state and Oakley or Madisonville were set by the I.C.C., because they involved interstate transportation. The rates between Oakley and Madisonville were not subject to I.C.C. regulation. Shippers incurred a lower total cost of transportation by bifurcating their shipments, because the lower rates in effect between Oakley and Madisonville, coupled with the rates for shipping between points south to Oakley, were less than the costs of shipping directly from points south to Madisonville.

The railroad brought suit against the shippers, arguing that the latter should not be permitted to avoid the higher interstate tariffs between southern points of origin and Madisonville by carving the transportation up in this fashion. The shippers argued that the question of whether a particular shipment of goods was a matter of interstate transportation turned upon the particular contract under which the goods

were shipped. If the contract designated points of origin and destination within a single state, then the shipment was intrastate and not subject to the I.C.C. tariffs.

The court rejected this argument, *Settle, supra* at 169, 43 S.Ct. at 30. Instead, it concluded that the appropriate test to determine if a particular intrastate link of a larger interstate shipment constitutes intrastate or interstate transportation is whether "the original and persisting intention of the shippers" was to transport those goods across state lines, *id.* at 174, 43 S.Ct. at 31. *See also Southern Pacific Transportation, supra* at 617.

In this case, TICO asserts that an unspecified number of the cars for which Ford has made damage claims were manufactured in Michigan and were never transported outside of Michigan. Thus, under the test enunciated by the Court in *Settle*, Ford had an original and persisting intention to ship the cars only within the boundaries of a particular state.

No evidence has been presented on this issue by Ford. The court concludes therefore, that, had this issue been properly and timely raised by TICO, it would have precluded summary judgment with respect to those claims on which there was a material question of fact concerning the intended destination of the cars. Because, as the court has concluded, this issue has not been presented in a timely fashion, TICO is not entitled to rely upon it at this time in order to create a material question of fact regarding Ford's motion.

**Ford's Request That it be Permitted to Offset Outstanding Freight Charges Against Amounts Owing on its Damage Claims**

 Ford has requested that it be permitted to offset $216,036.89 in outstanding freight charges against ATI's liability for the unprocessed damage claims. Neither TICO nor ATI's trustee in bankruptcy has objected to such a set-off. The court concludes that allowance of such a set-off is within its discretion, *see Bohack v. Borden, Inc.,* 599 F.2d 1160 (2d Cir.1979), and that such a set-off will facilitate the resolution of this action. Consequently, it concludes that Ford is entitled to such a set-off.

**Ford's Request that the Court Direct the Manner in Which Ford's Unprocessed Claims be Verified**

 Ford requests that the court establishes the manner in which the unprocessed claims of Ford be verified, pursuant to Fed.R.Civ.P. 56(d).[11] The court directs that such verification should proceed according to the procedures established by the Interstate Commerce Commission, 49 C.F.R. 1005.1–1005.7 (1983) or the parties each should suggest an appropriate method of reviewing the claims that can be done as inexpensively as possible. These suggestions should be filed within 20 days from the date of this order. The court will review the suggestions and enter a further order in this matter.

For the foregoing reasons, Ford's Motion for Summary Judgment is granted in full.

SO ORDERED.

11. The Rule provides as follows:

 **(d) Case Not Fully Adjudicated on Motion.** If on motion under this rule judgment is not rendered upon the whole case or for all the relief asked and a trial is necessary, the court at the hearing of the motion, by examining the pleadings and the evidence before it and by interrogating counsel, shall if practicable ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted. It shall thereupon make an order specifying the facts that appear without substantial controversy, including the extent to which the amount of damages or other relief is not in controversy, and directing such further proceedings in the action as are just. Upon the trial of the action the facts so specified shall be deemed established, and the trial shall be conducted accordingly.