COMMAND TRANSPORTATION,
INC., Plaintiff,

v.

B.J.'S WHOLESALE CLUB, INC.; Ames
Department Stores, Inc.; Morse Shoe,
Inc.; Lionel Leisure, Inc.; Liberty Mu-
tual Insurance Company and Home In-
surance Company, Defendants.

Civ. A. No. 90–10188–G.

United States District Court,
D. Massachusetts.

June 23, 1994.

Richard D. Bickelman, Holly K. Salamido,
Deutsch, Williams, Brooks, DeRensis, Hol-
land & Drachman, Boston, MA, for Com-
mand Transp., Inc.

Peter A. Johnson, Lane & Altman, Boston,
MA, for B.J.'s Wholesale Club, Inc., Ames
Dept. Stores, Inc.

William F. Lee, Michael G. Bongiorno,
Hale & Dorr, Boston, MA, for Morse Shoe,
Inc.

David J. Daly, Lecomte, Emanuelson &
Tick, Boston, MA, for Liberty Mut. Ins. Co.

David M. Crowley, Dolbec, McGrath,
Crowley & White, Boston, MA, Edward Far-
man, Schindel, Cooper & Farman, New York
City, for Home Ins. Co.

Herbert D. Lewis, Lewis & Lewis, Boston,
MA, for Lionel Leisure, Inc.

### MEMORANDUM OF DECISION

GARRITY, Senior District Judge.

This action involves the interpretation of
an insurance arrangement entered into by
Liberty Mutual Insurance Company ("Liber-
ty") and Command Transportation, Inc.
("Command"). Plaintiff Command was a mo-
tor carrier engaged in the business of ship-
ping freight for numerous clients, including
the shippers originally named as defendants
in this action, B.J.'s Wholesale Club, Inc.,
Ames Department Store, Inc., Morse Shoe,

Inc, and Lionel Leisure, Inc. (collectively, "the defendant shippers"). When Command became insolvent in 1986, the defendant shippers owed Command for outstanding freight charges. The shippers, however, had reciprocal claims against Command based on damage to and loss of goods they had entrusted to Command. The shippers asserted that they should be entitled to set off their claims against Command, thereby reducing the amount of freight charges they would owe. Command looked to Liberty to pay the shippers claims directly pursuant to the terms of an endorsement ("the BMC–32 endorsement") attached to the insurance policy. Liberty recognized its obligation to make direct payment to the shippers and has paid at least some of the shippers' claims. Liberty now asserts that, because the BMC 32 endorsement created a surety relationship between the parties, it is entitled to subrogation rights vis-a-vis the shippers; that is, Liberty can "step into the shoes" of the shippers and reduce its liability just as the shippers would have done if Liberty had not first paid off their claims. Liberty may assert this set-off, however, only if it first proves the existence of a surety relationship.[1]

This action is currently before the Court pursuant to the parties agreement that all remaining issues will be decided by the Court on stipulated facts. *See Boston Five Cents Sav. Bank v. Dept. of Housing,* 768 F.2d 5, 11–12 (1st Cir.1985). Command originally brought breach of contract and quantum meruit claims against each of the defendant shippers, as well as counts alleging breach of contract, violation of M.G.L. c. 93A, and a right to reach and apply against Liberty and another insurer, Home Insurance Company. Command also sought a judicial declaration of the parties' respective rights under 28 U.S.C.A. § 2201. Each of Command's claims has been settled and dismissed by stipulation, as have the shippers' and Home Insurance's corresponding counterclaims. What remains are Liberty's counterclaims against

Command. In addition to the claim of suretyship and subrogation outlined above, set out in Count II of its counterclaim, Liberty also alleges in Count I that Command has breached the insurance contract by failing to pay premiums and in Count III that it is entitled to reach and apply any recovery had by Command against any other defendant in this case. Since Liberty's claims have been dismissed, Count III is moot. This Court has jurisdiction because Liberty's counterclaims arise under an Act of Congress regulating commerce, 49 U.S.C. § 10927(a)(3), a provision of the Interstate Commerce Act. 28 U.S.C. § 1337(a); *Ford Motor Co. v. Transport Indem. Co.,* 795 F.2d 538, 543–44 (6th Cir.1986). Liberty and Command have submitted a Stipulation of Facts with exhibits and memoranda outlining their respective positions. A hearing was held on March 28, 1994 on the matter.

*Facts*

Liberty and Command have stipulated to the following facts:

1. Plaintiff Command Transportation, Inc. was, at all times material hereto, a corporation duly organized under the laws of the Commonwealth of Massachusetts.

2. Liberty Mutual Insurance Company is a Massachusetts insurance company licensed to do business in the Commonwealth of Massachusetts pursuant to M.G.L. c. 175.

3. B.J.'s Wholesale Club, Inc. ("B.J.'s) is a corporation duly organized by law with a principal place of business in Natick, Massachusetts. A Settlement Order of Dismissal was issued by this Court on February 25, 1994 with respect to Command's and B.J.'s claims against each other. Command and B.J.'s have settled their respective claims against each other, and said settlement involved no payment between the two parties.

---

**1.** Liberty also claims subrogation rights arising from indemnity agreements Command entered into with Liberty, whereby Command must indemnify Liberty in full for any monies, including attorney fees, paid by Liberty in connection with "bonds, undertakings and/or obligations of suretyship or guarantee" issued on behalf of Command. Liberty has not entered any bonds issued on behalf of Command into the stipulated record. Any potential obligation of Command under these agreements is thus dependent on the existence of an "obligation of suretyship" stemming from the BMC–32 endorsement.

4. Lionel Leisure, Inc. ("Lionel") is a duly organized foreign corporation with a principal place of business in Philadelphia, Pennsylvania. On June 14, 1991 Lionel filed a petition for relief under Chapter 11 of the Bankruptcy Code, and Lionel filed a Suggestion of Bankruptcy with this Court on or about July 23, 1991. Command has filed a claim in the Lionel bankruptcy proceedings on or about August 6, 1991.

5. Morse Shoe, Inc. ("Morse") is a Delaware corporation with places of business in Boston and Canton, Massachusetts. On January 24, 1991, Morse filed a petition for relief under Chapter 11 of the Bankruptcy Code, and Morse filed a Suggestion of Bankruptcy with this Court on or about February 6, 1991. On March 28, 1994, this Court granted Morse's Motion to Dismiss All Claims Between Command and Morse. Command filed a claim in the Morse bankruptcy proceedings on or about April 5, 1991. Morse and Liberty have dismissed their respective claims against each other.

6. Ames Department Stores ("Ames") is a Delaware Corporation with a principal place of business in Rocky Hill, Connecticut. On April 25, 1990 Ames filed a petition for relief under Chapter 11 of the Bankruptcy Code. Command filed a claim in the Ames bankruptcy proceedings on or about May 16, 1990. On July 17, 1990 this Court issued a Procedural Order of Dismissal with respect to Command's claims against Ames.

7. Home Insurance Company ("Home") is a New Hampshire insurance company licensed to do business in the Commonwealth of Massachusetts pursuant to M.G.L. c. 175. Home is no longer a party to this case.

8. Command was a common carrier which provided motor transport services to defendants B.J.'s, Ames, Morse and Lionel (collectively sometimes referred to hereinafter as the "defendant Shippers".)

9. Liberty issued Motor Truck Cargo Policy No. K01–712–001357–04 (the "Policy") with Command as the named insured on November 1, 1980.

10. The Policy contained an endorsement for motor common carrier policies of insurance for cargo liability pursuant to Section 10927(a)(3) of the Interstate Commerce Act which is commonly referred to as a "BMC–32 endorsement."

11. The BMC–32 endorsement contains the following language:

The insured agrees to reimburse the Company for any payment made by the Company on account of any loss or damage involving a breach of the terms of the policy and for any payment that the Company would not have been obligated to make under the provisions of the policy, except for the agreement contained in this endorsement.

12. Command executed indemnity agreements with Liberty on April 6, 1984 and October 3, 1988.

13. Reliance Motor Express, Inc., executed an indemnity agreement with Liberty on August 10, 1981. Reliance merged into Command on or about June 30, 1982.

14. Liberty has paid certain monies to one or more of the defendant Shippers pursuant to its obligations under the BMC–32 endorsement.

15. On or about December 12, 1986 Command and Comfed Savings Bank ("Comfed") executed a Revolving Finance Agreement pursuant to which Command granted Comfed a security interest in all those assets of Command described in the Revolving Financing Agreement and Form UCC–1 financing statement No. 656591 and Rider thereto (the "Collateral").

16. The above-mentioned Form UCC–1 financing statement No. 656591 and Rider were filed with the Office of the Secretary of State of Massachusetts by Comfed on December 16, 1986.

17. By April 1989 Command was insolvent.

18. In or about April 1989 Command entered into agreements with Munson Transportation to sell substantially all of Command's assets to Munson Transportation. The proceeds of the sale of the assets were paid to Comfed which held a security interest in those assets. Command also undertook at that time to collect its accounts receivable and the proceeds from such collections were

paid to Comfed to reduce Command's indebtedness to Comfed.

19. At the time of the filing of this lawsuit, Comfed had a security interest in Command's collateral, including the accounts receivable due from the defendant Shippers and Command's secured indebtedness to Comfed exceeded $3,600,000.

20. In December 1990 Comfed was placed into conservatorship and the Resolution Trust Corporation ("RTC") was the conservator.

21. In September 1991 the RTC was appointed receiver for Comfed.

22. On December 11, 1991 the RTC, as receiver for the RTC, filed Form UCC–2 Continuation Statement No. 062944 with respect to the above-mentioned Form UCC–1 No. 656591.

23. On or about September 25, 1992 Command received $21,118.53 and certain Subordinated Commercial Notes in the aggregate amount of $26,000 in payment of its claim as a creditor of the bankruptcy estate of Morse.

## *Discussion*

### I. *Suretyship and Subrogation*

The Interstate Commerce Act, at 49 U.S.C. § 10927(a)(3), authorizes the Interstate Commerce Commission ("ICC") to

"require a motor common carrier providing transportation under a certificate to file with the Commission a type of security sufficient to pay a shipper or consignee for damage to property of the shipper or consignee placed in the possession of the motor carrier as a result of transportation provided under this subtitle."

The primary purpose of § 10927(a)(3) is to assure to shippers that the carrier has financial responsibility to pay for the losses created by its operations. *See Canal Ins. Co. v. First General Ins. Co.,* 889 F.2d 604, 611 (5th Cir.1989); *Carolina Casualty Ins. Co. v. Un-*

*derwriters Ins. Co.,* 569 F.2d 304, 313 (5th Cir.1978).[2] Pursuant to § 10927(a)(3), the ICC issued its "Endorsement for Motor Common Carrier Policies of Insurance for Cargo Liability"—the BMC–32 endorsement. "The ICC endorsement constitutes a *supplemental* insurance agreement at law, by which the insurer is obligated to pay the shippers of goods … for any loss of or damage to property that results from the transportation of the shipped goods by the insured cargo carrier, up to a specified maximum amount." *Ford Motor Co. v. Transport Indemnity Co.,* 41 B.R. 433, 436 (D.C.1984) (emphasis added), *rev'd on other grounds, Ford Motor Co. v. Transport Indem. Co.,* 795 F.2d 538 (6th Cir.1986).

The BMC–32 endorsement serves to protect shippers by obligating the insurer to make payment for losses directly to the shippers "regardless of whether the motor vehicles, terminals, warehouses, and other facilities used in connection with the transportation of the property hereby insured are specifically described in the policy or not." However, while the endorsement imposes additional duties on the insurer and may supplant some of the provisions of the insurance policy, it does not abrogate the entire policy. *See Insurance Co. of North America v. W.B. Delafield,* 278 F.2d 683 (5th Cir.1960). The endorsement expressly provides that "all terms, conditions, and limitations in the policy to which this endorsement is attached are to remain in full force and effect as binding between the insured and the Company." In order to determine the existence and extent of a suretyship, the endorsement must be read in conjunction with, not in lieu of, the policy.

In the leading case on this question, *In re Yale Express System, Inc.,* 362 F.2d 111 (2d Cir.1966), Yale Express was a bankrupt motor carrier which had a motor cargo liability policy with Boston Insurance Company. The insurance policy was supplemented

---

**2.** These Fifth Circuit cases involve the interpretation of an endorsement, BMC–90, issued by the ICC to ensure compliance with 49 U.S.C. § 10927(a)(1). Section 10927(a)(1) mandates that the ICC issue an operating permit only if a motor carrier has filed with the ICC an adequate bond, insurance policy or other type of security sufficient to pay for each final judgment against the carrier for bodily injury or death of an individual resulting from the carrier's negligence. Sections (a)(1) and (a)(3), which applies to property losses and damage, both were intended to provide protection to third parties, the general public and shippers, respectively.

by a federally mandated endorsement, a predecessor to the BMC–32 endorsement. Under the endorsement, Boston was obligated to pay any shipper or consignee for all loss or damage to property coming into Yale's possession for which the carrier might be held legally liable. Just as here, the endorsement required the motor carrier to reimburse the insurer "for any payment that the [insurer] would not have been obligated to make under the provisions of the policy, except for the agreement contained in this endorsement." *In re Yale Express*, 362 F.2d at 113. Yale filed a petition for reorganization under Chapter X of the Bankruptcy Code. Some of the shippers which owed freight charges to Yale asserted claims against it for lost or damaged freight. Yale demanded that Boston pay the shippers directly. Boston admitted liability to the shippers but claimed, as a surety subrogated to the shipper/creditors' claims, a right to deduct the outstanding freight charges from the amounts it proposed to pay to the shippers for freight damage and loss claims.[3] An informal arrangement was temporarily entered into with the trustee allowing Boston to set off the outstanding freight charges, an arrangement which "applied only to claims payable by Boston under the endorsement." *Id.* This arrangement fell through and litigation ensued. Judge Friendly, writing for the Court, concluded "swiftly but surely that Boston was a surety *for the claims payable solely under the endorsement*", *Yale* at 114 (emphasis added), and explained:

"Suretyship is the relation which exists where one person has undertaken an obligation and another is also under an obligation or other duty to the obligee, who is entitled to but one performance, and as between the two who are bound, one rather than the other should perform. ALI, Restatement, Security § 82. Both Yale and Boston are obligated to the shipper, and Yale's promise to reimburse Boston for any payments made solely by virtue of the endorsement shows that it rather than Boston is the principal who 'should perform'."

*Yale* at 114.

■ The language of the BMC–32 endorsement essentially mirrors that of the endorsement in *Yale Express*.[4] Command agreed to reimburse Liberty for payments it might make to the shippers that it would not have been obligated to make under the policy itself. The plain language of the endorsement indicates a limit on the payments for which Command is required to provide reimbursement. In *Yale Express*, Judge Friendly recognized that limit and was careful to state that the surety relationship applied only to those payments which were made solely under the endorsement, not to those for which Boston would have been liable under the policy as well.

In *Empire Fire & Marine Ins. Co. v. J. Transport*, 880 F.2d 1291 (11th Cir.1989), the Court interpreted language identical to that contained in the BMC–32 endorsement. The endorsement there at issue, attached to the policy of insurance as mandated by the ICC pursuant to 49 U.S.C. § 10927(a)(1), obligated the insurer Empire to pay any final judgment recovered against the insured J. Transport for bodily injury to or death of any person resulting from the negligence of the

---

**3.** Generally, subrogation is an equitable remedy which is implicated when one person discharges the duty of another and the other would be unjustly enriched by the retention of the benefit conferred. Restatement, Security § 141 cmt a (1941). *See Pearlman v. Reliance Insurance Co.*, 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962). In a surety situation, when the duty of the principal is discharged by the surety, the surety may "step into the shoes" of the creditor and assert the creditor's rights. *National Shawmut Bank of Boston v. New Amsterdam Casualty Co.*, 411 F.2d 843 (1st Cir.1969); *accord, Pearlman*, 371 U.S. at 137, 83 S.Ct. at 235 ("[A] surety who pays the debts of another is entitled to all the rights of the person he paid to enforce his right to be reim-

bursed."); Restatement, Security § 141 cmt a (1941) ("Equity, in effect, creates in the surety who has performed, rights similar to those of the creditor before the duty to him was discharged.")

**4.** The BMC–32 endorsement contains one additional basis for reimbursement; the insured is liable for reimbursement for payments made by the insurer "on account of any loss or damage involving a breach of the terms of the policy ..." Liberty has not offered any evidence indicating that its payments to the shippers arose from a breach of the policy by Command. Rather, it has argued that *Yale Express*, in which this basis was not at issue, is controlling.

insured. *Empire Fire & Marine*, 880 F.2d at 1298, n. 9. The endorsement further provided for J. Transport "to reimburse [Empire] ... for any payment that [Empire] would not have been obligated to make under the provisions of the policy except for the agreement contained in this endorsement." *Id.* An accident occurred, and the injured persons brought suit in district court in Kentucky claiming that J. Transport was negligent. On the date of the accident, however, J. Transport was carrying insurance not only from Empire but also from another insurer, Paxton National Insurance Co. The insurers sought a declaratory judgment as to which was responsible for insurance coverage, and the district court entered an order finding both to be equally responsible, whereupon the insurers each paid one-half of the settlement reached with the injured plaintiffs.

Empire then filed a separate action in district court in Georgia seeking reimbursement from J. Transport pursuant to the ICC endorsement. The district court found that, because the issue of reimbursement "could have been raised" in the earlier case, res judicata applied and Empire's claim was barred. *Id.* at 1293. The Eleventh Circuit reversed, holding that, since the underlying action was one for declaratory judgment, the proper res judicata standard was less stringent—only those claims which were "actually litigated" were barred. *Id.* at 1296–97. The Court of Appeals noted that, in reaching its determination on insurance coverage, the Kentucky court did not "actually decide the issue of whether there was coverage under Empire's policy with J. Transport independent of the ICC endorsement"; it "did not determine whether Empire's liability in the underlying action arose "solely" by virtue of the endorsement."

> "Since Empire's policy of insurance was in effect at the time of the accident, *the provisions of the policy may provide an independent basis for Empire's liability.* It is clear that while ICC regulations require the carrier, or its certified insurer, to protect the public from loss due to negligent acts, the regulations do not alter or affect the obligations between the insured and the insurer ..."

*Id.* at 1298 (emphasis added) (internal footnote omitted). Thus, the district court's obligation on remand was to look to the provisions of the policy to evaluate the scope of the endorsement.

In the instant case, Liberty seeks to set off the freight charges up to the entirety of the payments it has made to the shippers. But it has failed to distinguish between payments made pursuant to the endorsement and those it would have been obligated to make under the policy apart from the endorsement. In fact, Liberty did not include a copy of the entire cargo policy among the exhibits the parties affixed to the Stipulation of Facts. It did submit a one-page form entitled "Motor Truck Policy—Gross Receipts" which lists Command as the named insured and provides the date coverage commences (11/1/80), the dollar figures for limits of liability, the amount of deductible to be applied, and an estimated premium to be paid. The form does not, however, provide any understanding of the potential circumstances which would give rise to an obligation on Liberty's part to pay claims under the policy. As such, Liberty has failed to meet its burden of proving that its payments arose solely under the endorsement.

## II. *Possible Set-off of Deductibles*

The form entitled "Motor Truck Cargo Policy—Gross Receipts" provides that "[e]ach loss shall be adjusted on the basis of a Deductible of $2,500." Thus, if the payments made directly to the shippers were for the entirety of the shippers' losses, Liberty could have a valid claim for set-off to the extent that its payments represent deductibles it would not have been obligated to pay under the policy. This proposition finds support in a recent decision, *American Inter-Fidelity Exchange v. American Re-Insurance Co.*, 17 F.3d 1018 (7th Cir.1994). *See also Ford Motor Co. v. Transport Indem. Co.*, 41 B.R. 433 (D.C.1984), *rev'd on other grounds, Ford Motor Co. v. Transport Indem. Co.*, 795 F.2d 538 (6th Cir.1986).

However, Liberty has not adequately proven such a claim. It has submitted an affidavit (not stipulated to by Command) of Elena Salvati, Claims Representative Supervisor of

Liberty, but that simply lists the total amounts paid by Liberty to each defendant shipper. It does not provide a basis for differentiating payments which represent deductibles from those which do not. There is no evidence indicating the number of losses, the dates of the losses or the amount of each loss; nor any that the $2,500 deductible indicated in the "Gross Receipts" form stamped "CANCELED" was in effect when losses were sustained. There is thus no basis for a finding that Liberty is entitled to be reimbursed for the deductible portion of any loss.

Because a surety relationship cannot be supported by the current record, we do not reach the question of subrogation. Even if we did, there remains a further obstacle to Liberty's recovery, inasmuch as subrogation is an equitable remedy. *See Pearlman,* 371 U.S. at 136, n. 12, 83 S.Ct. at 234, n. 12 ("The right of subrogation is not founded on contract. It is a creature of equity; is enforced solely for the purposes of accomplishing substantial justice; and is independent of any contractual relations between the parties.") In *Yale Express,* the case was remanded with instructions for the District Court to recognize the equitable right to subrogation and approve the insurer's application for set off if it was determined that the equitable rights of the insurer would not unduly interfere with the rehabilitative purpose of the bankruptcy statute. This the lower court could do, having all of the parties with an interest in the decision joined in the reorganization proceeding. *Yale Express* at 116–17. Similarly, in *In re Eastern Freight Ways, Inc.,* 577 F.2d 175, 180, n. 10 (2d Cir.1978), the other case upon which Liberty principally relies,[5] the Second Circuit specifically declined to address the question of whether "the rights of the perfected assignees of the accounts receivable are prior to and superior to the surety's equitable lien over the setoffs", leaving that determination for the bankruptcy judge on remand. Liberty's problem in the instant case is that the entity holding a secured interest in Command's accounts receiv-

able, the Resolution Trust Corporation, is not and cannot be joined as a party to these proceedings. See this Court's Memorandum of Decision dated February 25, 1994.

For the foregoing reasons, the court finds that Liberty has failed to prove that it is entitled to recover on Count II of its Amended Counterclaim and judgment shall be entered for Command on that count.

### III. *Breach of Contract*

■ On its breach of contract claim, Liberty has also failed to meet its burden of proof. The sole item of evidence offered by Liberty to support its breach of contract claim is a Statement of Account dated September 20, 1989. The statement totals "Earned Premiums" under various policies issued after October 1, 1988, subtracts "Retro Adjustments" to various other policies, and finally arrives at a "Balance Due" of $656,330.04. One "retro adjustment" in the amount of $186,159.00 was to policy # K01 712 001357 047.

In its amended counterclaim, Liberty alleges that Command failed to pay premiums on a contract of insurance issued by it on November 1, 1980. Yet it claims damages in the amount of $656,330.04, the entire amount indicated as due under all of the policies listed on the statement of account. The only policy before the Court is the Motor Truck Policy, *see infra* at 13, issued on November 1, 1980 and numbered K01–712–001357–04 (this number differs by only one digit from that found on the statement of account under "retro adjustments"). There is no indication in the evidence submitted, including in the statement of account, that Command continues to owe premiums under that particular policy; we know only that a "retro adjustment" was made to that policy. Without the terms of the policy, including proof as to the dates coverage was in effect, it would be speculative to conclude that Command has failed to pay any premiums owed.

---

**5.** *Eastern Freight Ways* does not aid Liberty in its argument that a suretyship exists. In that case, Seaboard Surety Company wrote surety bonds for the motor carrier which was self-insured. These bonds, upon which Seaboard performed, were the basis for the suretyship. *Eastern Freight Ways,* 577 F.2d at 180, n. 9. There is no mention of any endorsement in the court's opinion.

*Conclusion*

For the foregoing reasons, judgment shall be entered in favor of Command on each of the counts in Liberty's Amended Counterclaim.